815 So.2d 1041 (2002)
STATE of Louisiana
v.
Germaine MITCHELL.
No. 01-0872.
Court of Appeal of Louisiana, Third Circuit.
February 13, 2002.
*1042 J. Phillip Haney, District Attorney, Thomas C. Senette, Assistant District Attorney, Franklin, LA, Counsel for Plaintiff/Appellee State of Louisiana.
Lawrence Charles Billeaud, Louisiana Appellate Project, Lafayette, LA, Counsel for Defendant/Appellant Germaine Mitchell.
*1043 Court composed of NED E. DOUCET JR., Chief Judge, JIMMIE C. PETERS and MARC T. AMY, Judges.
AMY, Judge.
The defendant was charged with second degree murder in the shooting death of one victim and attempted second degree murder in the injury of another. A jury found the defendant guilty of manslaughter and aggravated battery. The defendant now appeals the convictions, questioning the sufficiency of the evidence. For the following reasons, we affirm the convictions. We further remand this matter with instructions to the trial court to inform the defendant of the applicable postconviction relief period.

Factual and Procedural Background
The events at issue in this criminal appeal occurred on November 26, 1997 in Breaux Bridge, Louisiana. The State alleges that the defendant, Germaine Mitchell, and two acquaintances, Demond Ledet and Ervin Mitchell, traveled to the home of Kaisha Landry. Ms. Landry was the defendant's girlfriend and the mother of his young child. While visiting the neighborhood, an argument arose between the three men and several men from the neighborhood, including the victim, Alton Francis, who died later in the day.[1] After the altercation turned physical, Germaine, Demond and Ervin left the area.
Later in the evening, the defendant and Ervin returned to the area in the defendant's vehicle. Although witness statements varied as to the particularities of the event at issue, the record indicates that Ervin and the defendant were approached by Alton Francis, Alphonse Alexander, and Willis Alexander. The State contends that, at some point, the defendant entered the passenger compartment of the vehicle, retrieved a gun, pointed it at Alton Francis and fired. The record indicates that Mr. Francis ran into the home of Joyce Landry and died on the floor from a gunshot wound to the chest. The State contends that the defendant continued to fire, striking neighbor Felton Johnson in the abdomen and arm. The defendant then left the scene. The defendant was charged by bill of information on January 21, 1998, with attempted first degree murder in the shooting injury of Felton Johnson. Additionally, he was indicted by a grand jury on February 10, 1998, with the charge of second degree murder, a violation of La.R.S. 14:30.1. The defendant's attempted first degree murder charge was amended on August 30, 1999, to the offense of attempted second degree murder, a violation of La.R.S. 14:30.1 and La.R.S. 14:27.
Both charges were consolidated for trial and on September 23, 1999, on the charge of attempted second degree murder, the jury found the defendant guilty of aggravated battery, a violation of La.R.S. 14:34. Additionally, on the charge of second degree murder, the jury found the defendant guilty of manslaughter, a violation of La. R.S. 14:31.
The defendant moved for a new trial on October 29, 1999, asserting that the State made an improper reference to the defendant's decision not to testify in its rebuttal argument. The motion was granted by the court on December 9, 1999. The State filed a writ application with this court which was denied with the finding there was no error in the trial court's ruling of December 9, 1999. See State v. Mitchell, an unpublished writ opinion bearing docket *1044 number 00-23 (La.App. 3 Cir. 4/17/00). The State thereafter applied for supervisory and/or remedial writs to the Supreme Court of Louisiana. The supreme court reversed the trial court's granting of the new trial and remanded the matter for sentencing. State v. Mitchell, 00-1399 (La.10/13/00); 771 So.2d 93.
The defendant was sentenced on April 30, 2001, to serve ten years at hard labor for the manslaughter conviction and five years at hard labor for the aggravated battery conviction. The sentences were ordered to run concurrently.
The defendant appeals, arguing that the evidence was insufficient to sustain the convictions in light of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In particular, the defendant points to the variations and inconsistencies in testimonies of the State's witnesses.

Discussion

Errors Patent
As is required by La.Code Crim.P. art. 920, we have reviewed this matter for errors patent on the face of the record and observe that the defendant was not informed of the two-year time limit for filing post-conviction relief as is required by La. Code Crim.P. art. 930.8. Thus, we remand this matter with instructions to the trial court to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Clark, 00-818 (La.App. 3 Cir. 12/6/00); 780 So.2d 418.

Sufficiency of the Evidence
The defendant contends that evidence presented for both convictions was insufficient to support the convictions. In particular, he references what he terms the "clearly contradictory and impeached testimony of the lay witnesses presented by the State[.]" As an example, he points to one witness's statement that Alton Francis "possessed a bat for use against Germain Mitchell. However, another eye witness... clearly denied the existence of any bat." He also contends that cross-examination of the State's eyewitnesses revealed that there was a significant motivation for lying. He contends that, because there was no "uncontradicted and/or unimpeached testimony" to support the convictions, they must be reversed pursuant to State v. Mussall, 523 So.2d 1305 (La.1988).
When considering a sufficiency of the evidence argument, the appellate court views the evidence in the light most favorable to the State and then determines whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Furthermore, in order for the State to obtain a conviction following a plea of not guilty, the State must prove the elements of the crime beyond a reasonable doubt. La.R.S. 15:271.
The defendant was charged with second degree murder and attempted second degree murder. The jury, however, found the defendant guilty of the responsive verdicts of manslaughter and aggravated battery. Although the evidence was arguably sufficient to support the charged offenses, see State v. Porter, 93-1106 (La.7/5/94); 639 So.2d 1137 and State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), we review the verdicts entered by the jury.

Manslaughter
Manslaughter is defined in La.R.S. 14:31(A)(1) and (2). The trial court instructed *1045 the jury as to La.R.S. 14:31(A)(1), which provides:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
Although the defendant does not dispute that he shot and fatally injured Alton Francis, he disputes the events leading to the shooting. The defendant correctly argues that the participants in the day's events, both the altercation earlier in the day and the subsequent altercation at issue, testified differently as to the particulars of the surrounding circumstances. Furthermore, their statements differed in some respects from the statements given to the officers investigating the matter. Although the variation in the accounts is evident in the summary of testimony below, importantly, many of the significant of the events of the day, i.e., the actors involved and the actual shooting, were consistently related by the witnesses.
The defendant and his friends, Demond and Ervin, traveled to Breaux Bridge to visit the defendant's son at the home of the child's mother, Kaisha Landry. Kaisha lived at the home of her mother, Joyce Landry. Upon arriving at the house, the defendant walked to the house, with Demond and Ervin remaining outside. Ervin testified that a group of men, Alton Francis, Alphonse Alexander, and Willis Alexander, began to talk to the defendant.
The defendant reached the front of the house, had a discussion with Trinicia Edmond and, upon learning that Kaisha was not at home, began returning to the car. According to Ervin and Demond, Alphonse Alexander began spouting obscenities at the defendant and moving closer. A fight ensued between the defendant and Alphonse, with Alton becoming involved according to Demond's testimony. According to Alphonse's testimony, however, the defendant instigated the fight and, although he and the defendant exchanged blows, neither Alton nor Willis hit the defendant. Trinicia Edmond confirmed that the fight occurred, stating that Alphonse, Alton, and Willis were involved in the fight, but explaining that it originated between the defendant and Alphonse.
According to Demond, the fight ended with the defendant running from the scene. He and Ervin got into the defendant's car, picking up the defendant at another location. Demond testified that the three traveled in the car for a while and he eventually asked the defendant to take him home, which the defendant did. At some point, the defendant returned to the Landry home. According to Ervin, he did so because he was paged by Kaisha.
Kaisha testified that the defendant returned to the home and explained the earlier altercation to her mother. She testified that the defendant informed Joyce Landry that: "[T]hey fought with him and feels like nobody should keep him away from his child."[2] Joyce Landry asked the defendant to purchase some items at the *1046 store for her. When he returned, Joyce Landry heard "a fuss" outside.
Although the witnesses' testimonies vary as to the particularities of the subsequent events, they are in accord as to the general circumstances surrounding the shootings. According to Trinicia Edmond, when the defendant and Ervin returned from the store, Alton, Willis, and Alphonse, were on the side of Joyce Landry's house. They began to argue with Ervin who was on the street with the defendant. The three approached Ervin and the defendant. According to Trinicia, Alton was walking alongside the car, when Willis retrieved a baseball bat, giving it to Alton. According to her testimony, Alton continued to argue with Ervin. Although she stated at trial that he had a bat, she asserted that he never raised the bat toward Ervin. According to Trinicia, the defendant did not attempt to leave the scene, raise the gun, or tell Alton to stop his approach. Rather, the defendant raised a gun and started shooting. She stated that Alton was shot in the chest and that he turned and ran away. The record indicates that Alton died inside of Ms. Landry's house. Trinicia testified that the defendant continued shooting.
Alphonse also testified that someone presented Alton with a baseball bat. Like Trinicia, he stated that he did not see Alton raise the bat. He further testified that the defendant was sitting in his car, that he got out of the car, and then walked to the rear of it. He testified that neither he nor Alton said anything to defendant and defendant said to Alton: "I'm going to kill you bitch." He then pulled the gun. Alphonse stated that Alton told the defendant to "stop tripping." The defendant fired the gun.
Kaisha testified that the defendant returned from the store, gave her the items for Joyce Landry, and then began walking to the car. According to Kaisha as he returned to the car, "they started approaching him." She said that Ervin got out of the car, saying to Alton "what's up man. You ready, you ready to handle that." Kaisha stated that Alton approached Ervin, at which time, Ervin backed up. Although she stated that she never saw Alton with anything in his hands, she saw the defendant go into the car. She testified that she did not see the defendant shoot Alton, did not see Alton move in toward the defendant, nor did she see him raise anything indicating that he was about to hit the defendant. Joyce Landry testified that, when she went outside, she saw Ervin and Alton walking toward each other. She then heard the gunshot and saw Alton run into her house. She followed inside.
Bernice Alexander testified that her brother, Willis Alexander, went into her house to get a baseball bat during this second altercation and that he was angry. She went outside to see what was wrong and saw Alton and Ervin arguing. She stated that they were standing close to one another and that Alton was holding the baseball bat from her house. She testified that the defendant was inside the passenger side of the car and that, as Alton and Ervin argued, the defendant got out of the car, walked to the driver's side, pointed the gun at Alton and said: "man, I'm going to shoot your f______ a______." Bernice testified that following the statement, the defendant shot Alton. She denied that Alton raised the bat.
Felton Johnson, a neighbor and victim of the shooting, testified that he saw Alton walk down the street, tap on the hood of the car, and bend down to speak to speak to someone. He denied that Alton had a baseball bat in his hand. Felton testified that the defendant "just pulled out the gun and shot it."
*1047 The defense provided only one additional eyewitness, Ervin Mitchell. His testimony was offered in support of the defendant's contention that his actions should be viewed as self-defense or justifiable homicide. Ervin testified that after he and the defendant returned from the store, they went into the house to deliver the items. He stated that as he, the defendant, and Kaisha stood and talked outside, Alton, Willis, and Alphonse appeared from behind the house. Upon noticing the men and hearing their obscene language, he and the defendant decided to leave.
Ervin testified that he and Mitchell made it to the car and the defendant unlocked the passenger door. As he was doing so, Alton approached him from behind and tried to grab him. Ervin testified that he was trying to get away from Alton, but that Alton continued to argue with him, wanting him to fight. He then saw Willis run from the side of the house and hand something to Alton. He stated that Alton then pulled out a bat and swung at him. Ervin testified that Alton then attempted to swing at the defendant.
Ervin further testified that the defendant ducked as Alton tried to hit him. He then went around the car and was cornered by Alton between the ditch and the car. Ervin testified that defendant got into his car, got back out, and as Alton was about to swing again, the defendant ducked and fired the gun.
As the jury must have been, we are aware that the witnesses offered inconsistent testimonies and, as pointed out by the defendant, some of their statements contradicted statements made to investigating authorities. The most significant inconsistencies between trial testimony and pretrial statements involved whether Alton had a bat and whether or not it was raised. In State v. Taylor, 96-1043, p. 5 (La.App. 3 Cir. 2/5/97); 688 So.2d 1262, 1267, a panel of this court addressed witness credibility, stating:
A determination of the weight of evidence presented is a question of fact. The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witnesses and is a matter of weight of the evidence and not sufficiency. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Nolan, 503 So.2d 1186 (La.App. 3 Cir.), writ denied, 507 So.2d 226 (La. 1987).
A fact-finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305 (La.1988).
Although confronted with variations in witness testimony, we do not conclude that the jury's reliance on trial testimony and the ultimate verdict of guilty of manslaughter were irrational, especially in light of its function as a fact-finder and the deference given its credibility determinations as described above.
Essentially, the jury was presented with testimony indicating that the defendant and two acquaintances attempted to visit at the home of the defendant's girlfriend and child. Testimony indicates that, while at the home, they were harassed/intimidated by three neighborhood men. An altercation *1048 occurred, turning physical and causing the defendant to retreat. When he and Ervin returned later in the day, they were again approached by the same three men. According to witness testimony, the events occurred quickly, with Alton, a man of considerable size, approaching Ervin. Witness testimony even indicates that Willis Alexander left, returning with a bat. In short, the State presented evidence indicating that the defendant was presented with a quickly escalating situation, although it may not have been one necessarily found to be threatening to either his life or Ervin's. While this same testimony indicated that the defendant may have had sufficient time to retreat from the situation or sound a warning, he instead further escalated the confrontation, firing shots and killing Alton Francis. Given these circumstances and the credibility determinations best left with the trier of fact, it is our opinion that it was not irrational for the trier of fact to conclude that the defendant had the intent to kill Alton or cause him great bodily harm, but that he did so under "heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:30.1(A)(1). This argument lacks merit.

Aggravated Battery
The defendant also contests his conviction for aggravated battery in the shooting of Felton Johnson, again relying on his assertion that the witnesses offered inconsistent versions of events and that the shooting was justifiable or in self-defense.
La.R.S. 14:34 provides that: "Aggravated battery is a battery committed with a dangerous weapon." "Battery" is defined as "the intentional use of force or violence upon the person of another." La.R.S. 14:33.
Felton Johnson testified that he and the defendant knew each other and that they never argued. Additionally, Felton Johnson testified that he was not with Alton, Alphonse, or Willis on the day of the shooting. He denied making any aggressive moves toward the defendant. Instead, he contends that he was merely walking in the street, on his way to his brother's home, at the time of the shooting. Felton related his version of the shooting, testifying that he froze once Alton was shot. He continued, stating that Alton ran toward him, passed in front of him, and ran into the house. He explained that, although everyone else ran, he froze and ended up looking at the defendant. Felton stated: "He point the gun right at me. He looked at me and I looked at him." He was then shot. When asked what occurred next, Felton stated: "The only thing I know that I fell." The record indicates that Felton sustained injuries to his abdomen and arm from the shooting.
It is unquestioned that the injury resulted from the use of a dangerous weapon. As far as intent, Felton explained that he froze following Alton's shooting and that he ended up looking at the defendant, with the defendant pointing the gun at him. Thus, the jury was free to believe that the defendant intentionally fired in his direction.
Although the defendant again made arguments regarding self-defense/justifiable use of force, the jury was free to not accept this version of events. Testimony was offered indicating that, although confronted with a hostile situation, the defendant was not placed in a position where he was justified in firing at either Felton Johnson or Alton Francis. Whether the defendant was mistaken as to Felton's role in the altercation is of no moment if the jury chose to disbelieve the defendant's *1049 arguments regarding self-defense. This argument also lacks merit.

DECREE
For the foregoing reasons, the convictions of the defendant, Germaine Mitchell are affirmed. This matter is remanded to the trial court with instructions to inform the defendant of the applicable post-conviction relief periods as discussed above.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
PETERS, J., dissents and assigns written reasons.
PETERS, J., dissents.
I respectfully disagree with the majority's proposed affirmation of the defendant's convictions in this matter. In my opinion, the evidence presented by the state falls far short of establishing the elements of the crimes charged by a preponderance of the evidence as required by La.Code Crim.P. 804(A)(1). Additionally, the law is well settled concerning the appellate court's role in considering an assertion that the evidence is not sufficient to support a conviction.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559, at 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
State v. Fontenot, 616 So.2d 1353, 1357 (La.App. 3 Cir.1993), writ denied, 623 So.2d 1334 (La.1993).
Even though we as the reviewing court are not to second-guess the credibility determinations of the jury beyond the Jackson sufficiency evaluations, "Due Process requires the reviewing court to determine `whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988) (quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2789).
In Mussall, the supreme court discussed the role of the reviewing court in applying the Jackson analysis:
The Jackson v. Virginia doctrine involves more than simply applying a fixed standard to measure the simple quantum of the evidence produced in a case. Careful study must be given to both the majority and concurring opinions to fully understand the precise methodology which must be followed to determine objectively whether any rational trier of fact would have had a subjective doubt about the defendant's guilt. First, a review of a criminal conviction record for sufficiency of evidence does not require a court to "`ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Second, a reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any rational fact finder can. Third, the inquiry *1050 requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have found the essential elements of the crime beyond a reasonable doubt.
The principal criterion of a Jackson v. Virginia review is rationality. This is because under Winship and Jackson Fourteenth Amendment due process demands that in state trials, as has been demanded traditionally in federal trials, a criminal conviction cannot constitutionally stand if it is based on a record from which no rational trier of fact could find guilt beyond a reasonable doubt. Accordingly, under the Jackson methodology a reviewing court is required to view the evidence from the perspective of a hypothetical rational trier of fact in determining whether such an unconstitutional conviction has occurred. In reviewing the evidence, the whole record must be considered because a rational trier of fact would consider all of the evidence, and the actual trier of fact is presumed to have acted rationally until it appears otherwise. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
Id. at 1309-10 (footnotes omitted).
Because the principal criterion of a Jackson review is the concept of rationality, it follows that we must view the evidence from the perspective of a hypothetical rational trier of fact and not the average trier of fact. Id. In other words, the reviewing court must do more than determine whether the record contains testimony which tends to support each fact necessary to establish the elements of the crime charged. The reviewing court must determine if a "rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt." Id. at 1311. If it cannot so determine, then the conviction "cannot stand constitutionally." Id. I am concerned that the majority considered only the evidence favorable to the state rather than the whole record in a light most favorable to the state. Thus, while I agree with most of the majority's recitation of the evidence, I believe that other evidentiary matters not mentioned by the majority must be considered in determining whether this these convictions can stand. Thus, the following factual summary includes much of that which is stated in the majority opinion, but some facts required repeating for the sake of completeness.
On the evening of November 26, 1997, the defendant[1] shot and killed Alton Francis (Alton)[2] and shot and wounded Felton Joseph Johnson, Jr. (Felton). The shootings occurred on West Patin Street in Breaux Bridge, Louisiana, directly in front of the home of Joyce Landry (Joyce).[3] Earlier that afternoon, approximately two hours before the shootings, the defendant had been involved in another physical *1051 altercation at the same location with Alton and two of his friends, Alphonse[4] and Willis Alexander (Alphonse and Willis).
Alton is Joyce's nephew, and, in November of 1997, he had been living for the past five years with Bernice Alexander (Bernice) in her West Patin Street home near Joyce's residence. He was substantial in size,[5] thus the origin of his nicknames. Bernice is the sister of Alphonse and Willis and the mother of Alton's child born in 1995. While the record does not specify their address, it is clear that Alphonse and Willis also reside in the West Patin Street neighborhood.
The defendant was in the neighborhood on November 26 to visit his eighteen-year-old girlfriend, Kaisha Landry (Kaisha). Demond Ledet (Demond) and Ervin Mitchell (Ervin), two of the defendant's lifelong friends, accompanied him to the neighborhood that afternoon, but only Ervin accompanied the defendant when he returned in the evening hours. Demond was a convicted felon on probation for a drug violation, while Ervin was a college student home for the Thanksgiving holidays. Kaisha is Joyce's daughter and, thus, Alton's first cousin. On November 26, 1997, she was residing with her mother. She had given birth to the defendant's child the month before. Others involved in the afternoon or evening altercation included Trinicia Edmond (Trinicia), Joyce's seventeen-year-old niece, and Felton, a disabled offshore worker.
At trial, Demond, Joyce, Kaisha, Bernice, Alphonse, Trinicia, and Ervin all testified concerning some aspect of the events giving rise to the shootings. All but Ervin testified for the state. Their testimony is replete with conflicting versions of the events and contradictions within their individual testimony. Other witnesses included experts, investigating officers, and witnesses to matters occurring after the shootings. Generally, their testimonies further highlighted the inconsistencies within the principal witnesses' testimonies.
I initially note that there is no clear reason why the altercations occurred. The state contended that animosity between the defendant and Alton over the defendant's treatment of Kaisha gave rise to the physical disputes and supported this contention by the testimony of Trinicia and Demond. Trinicia testified that Alton had continuously harassed the defendant since the birth of Kaisha's baby because he thought the defendant was "messing around" on her. According to Trinicia, Alton constantly told Kaisha stories about the defendant to upset her and to sabotage their relationship. Demond testified that on one occasion the defendant told him that Alton wanted to "kick his a______" because he was dating other women while maintaining a relationship with Kaisha.
However, the testimony of other state witnesses did not support this contention. Both Joyce and Kaisha confirmed that verbal confrontations erupted each time the defendant encountered Alton, Alphonse, or Willis, but neither of the women could say that these confrontations had anything to do with Kaisha's pregnancy or the defendant's actions toward her. Bernice and Alphonse denied that any animosity existed between the men. They testified that the defendant and Alton had grown up together and that, according to Bernice, the defendant visited with Alton in her home on numerous occasions during the five years she and Alton resided together.
*1052 Alphonse testified that the underlying dispute was actually between him and the defendant. According to Alphonse, he and a friend of the defendant's had traded insults in the defendant's presence on the morning of November 26. The friend had called him a "b______," and, although not offended by the vulgarity, Alphonse repeated it to the defendant's friend. Alphonse suggested that the defendant thought he (Alphonse) was referring to him and took the vulgarity personally. Alphonse also related a verbal altercation that he claims to have had with the defendant the day before the shootings "over some wheels."
The evidence is overwhelming that Alphonse, not Alton, instigated the afternoon altercation. Demond testified that, on the afternoon of November 26, he, Ervin, and the defendant arrived at Joyce's house where the defendant intended to see Kaisha before the three men went to the Lafayette, Louisiana shopping mall. According to Demond, Trinicia met the defendant at the door of Joyce's home and informed him that Kaisha was not at home. As the defendant walked back toward his car, Alphonse, Alton, and Willis appeared. According to Demond, as Alphonse approached the car, he was "saying b______ this, b______ that,"[6] and he (Alphonse) and the defendant began arguing. Although he did not understand what the argument was about, it appeared to Demond that Alphonse "wanted to fight [the defendant]."
Demond, Trinicia, Bernice, and Ervin all testified that Alphonse instigated the physical altercation that followed and that Alton and Willis initially were only observers. They all agreed that, at first, Alphonse appeared to get the best of the defendant and that, when the tide of the altercation turned in the defendant's favor, Alton and Willis began hitting the defendant from behind. At this point, the defendant fled the scene on foot.
Of all the witnesses presented by the state, only Alphonse had a different version of the altercation. According to him, the defendant was still angry over the morning exchange and "want[ed] to fight with [him]" that afternoon. He suggested that the defendant entered Joyce's house, removed his watch in preparation for the fight, returned outside, and began pushing on him. Despite all the evidence to the contrary, he denied that Alton or Willis became involved in the physical conflict. He suggested that the fight stopped when they fell into a fence, and that, at that time, the defendant simply walked away.
Demond, Trinicia, and Bernice further testified that, after the defendant fled the scene, Alphonse continued to instigate trouble. They testified that a verbal exchange then began between Ervin and Alphonse, but at some point, Alton, Willis, and Alphonse began walking away. However, Demond testified that, before he and Ervin could leave the area, Alphonse returned and that he and Ervin again "started having words." He testified that, as he and Ervin got into the car, the verbal exchange continued and that, as they drove away, Alphonse began kicking the car. Alphonse denied even returning to the scene, much less having words with Ervin or kicking the car. Bernice and Trinicia confirmed the continued altercation and Alphonse's part in it except that Bernice did not see Alphonse kick the car.
While the sequence of events concerning when Demond, Ervin, and the defendant *1053 left the area is not clear from the testimony, at some point Trinicia telephoned the police to report the incident. When Breaux Bridge City Police Officer Clint Aubrey responded to the call, he found those standing around to be less than cooperative concerning the details of the altercation. He testified that he spoke to Demond, Ervin, Alton, Alphonse, and Willis at the scene and that he informed the assembled group that they needed to stop fighting before someone got hurt. According to Officer Aubrey, their response was to either turn their backs or simply lift their heads as if they were not listening.
Joyce had been at work when the afternoon altercation occurred, but Trinicia called her. She immediately came home. After arriving home, she instructed Alton, Alphonse, and Willis to leave her premises and to not return. However, shortly after instructing the three men to stay away from her home, she informed her sister, Jacqueline Francis,[7] that the instruction did not apply to Alton. Her efforts to control those who came to her house were because she was "tired of them ... fighting in the front of [her] house" every time the defendant appeared.
When Kaisha returned home and learned of the afternoon altercation, she paged the defendant who called her back and asked to be allowed to return to Joyce's house and to explain what had happened in the afternoon altercation. After receiving permission, the defendant and Ervin drove back to Joyce's home.
The state's witnesses could not agree concerning the events that occurred after the defendant's return as well. Trinicia testified that the defendant announced in a threatening manner that "he came back to handle his business, he came back to get his." However, Kaisha denied hearing the defendant utter any express or implied threats. According to her, the defendant simply explained the events of the afternoon and stated that he did not think anyone should try to keep him from seeing his baby. Joyce testified that the defendant announced to her that he was not coming back to her home because, every time he did, he had trouble with Alton, Alphonse, and Willis. She did not interpret any of the defendant's statements as threatening.
Joyce then asked the defendant to go to a store and purchase some headache powder for her, and the defendant and Ervin then left to run this personal errand. When they returned, they were again confronted by Alton, Alphonse, and Willis. This time, according to the three women, Alton appeared to be the primary instigator although Alphonse was in the middle of everything. As was the case in the afternoon altercation, Alphonse claimed that he instigated this altercation by exchanging verbal insults with Ervin.
According to Trinicia, Kaisha, and Joyce, when the verbal altercation began, Alton positioned himself between Ervin and the defendant's car, and Ervin retreated down the street. Joyce even ordered the three men to stop the argument, but they ignored her. At some point early in the verbal exchange, Willis went to Bernice's house, obtained an aluminum baseball bat, returned to the scene, and gave it to Alton. The state's five principal witnesses to what occurred next each saw the scene differently.
Trinicia testified that, as Ervin retreated down the street, the defendant got into *1054 the passenger side of the car, but then exited the vehicle. After Willis armed Alton with the baseball bat, Alton turned to face the defendant. According to Trinicia, the two men were four to five feet apart when, without warning, the defendant shot Alton in the chest. She testified that, despite the close proximity of the two men, Alton neither raised the baseball bat nor threatened the defendant before the defendant fired. According to Trinicia, Alphonse was standing close to Alton, and Willis was somewhere in the street when the shot was fired. She immediately ran into the house and observed nothing else outside thereafter. Trinicia testified that Alton followed her into the house and died on the living room floor. She recalled hearing only two shots.
Kaisha testified that she met the defendant and Ervin on the porch when they returned with the headache powder. She did not observe Alton, Alphonse, or Willis approach the defendant until after he and Ervin started walking back to the car. In contrast to Trinicia's testimony, Kaisha testified Ervin actually got back into the car before Alton arrived, but then exited the vehicle and began arguing with Alton. According to Kaisha, it was then that Alton blocked Ervin from the safety of the vehicle. She testified that, as Alton began to approach Ervin, the defendant moved to the passenger side of the car and, for a brief moment, went into the car. Despite observing the altercation from its beginning, Kaisha claims to have never seen Alton with a baseball bat or the defendant with a gun. Additionally, she did not see Alton turn toward the defendant or threaten him in any way before she heard a shot. She did not immediately retreat to the house when she heard the first shot, but simply fell to the ground. She remembers hearing three shots.
Joyce contradicts both Trinicia and Kaisha. According to Joyce, she instructed Kaisha to meet the defendant at his car, obtain the headache powder, and return inside before trouble could begin. She claims Kaisha followed these instructions and was inside of the house before any sign of trouble. It was only after she heard "like a fuss" outside that she instructed Kaisha to investigate what was going on outside. Joyce then went outside and observed Ervin and Alton in a verbal confrontation. She told both to stop the argument as "it's time to put and [sic] end [to it]." According to Joyce, she approached the front of the defendant's car and observed Alton, Alphonse, and Willis "all around like on each side, one of them." At this time, according to Joyce, the defendant was at the rear of the car. Despite being in such close proximity to the dispute, she testified that she did not see Alton armed with the baseball bat and that she did not see the shooting. She heard the first shot as she watched Ervin and Alton walking toward each other. She observed Alton run toward her house, and she followed him into the house.
Alphonse's version is that the altercation began as soon as the defendant and Ervin exited the car on their return from running the errand. According to Alphonse, he and Ervin exchanged curse words, and Ervin began retreating down the street with he, Alton, and Willis in pursuit. At this point, according to Alphonse, the defendant had not yet exited the car. When Alton, armed with the baseball bat, began leaning on the quarter panel of the car, the defendant exited the car, walked to the rear of the car, and told Alton that "I'm going to kill you b______." Alphonse testified that, when the defendant produced a gun, Alton told him "to stop tripping." At this time, according to Alphonse, the defendant was next to the trunk of the car, and Alton was positioned at the rear of the *1055 vehicle on the driver's side. Without any further warning, the defendant shot Alton. Alphonse testified that, when the defendant pointed the gun at him, he turned to run toward Felton's trailer located on the opposite side of the street from Joyce's house. As he ran away, Alphonse heard three more shots and observed the defendant shoot Felton. At that time, Felton was some thirty feet behind him, on the other side of the car, in Joyce's yard.
Bernice testified that she observed Willis run into her house, seize an aluminum baseball bat, and run out again. Because he appeared angry, she followed him outside and initially observed Ervin and Alton "fussing." According to Bernice, both men were on the driver's side of the car at arms length from one another, and Alton already had the baseball bat in his hand. At the same time, she observed Alphonse and Willis in the street on the same side of the car as Ervin and Alton. She observed the defendant get out of the passenger side of the car, move around the side of the car, and, as Ervin backed away, shoot Alton. She heard the defendant, who was by this time at arms length from Alton, say, "Man, I'm going to shoot your f______ a______." He then shot Alton in the chest, and Alton ran around the front of the car and into Joyce's house. Bernice did not recall how many shots she heard, but, as her brothers ran from the scene, she claims to have seen the defendant fire at them. She also claims to have seen the defendant shoot Felton.
Felton had spent the day sleeping off his "two case of beer a day" habit and was in the process of obtaining more beer when he unfortunately walked upon the scene. He testified that he initially saw Alton walk to the front of the car, tap on the hood, and say to the vehicle's occupant, "Hey man, what's up?" He could not see inside the vehicle because of the tinted windows. He then saw someone exit the passenger side of the car "and put their hand over the hood of the car and shot, bam, and it hit Heavy right here." As Alton turned and ran in his direction, Felton heard another shot. He claims that he then turned back toward the defendant and saw the defendant take aim at him and fire. Amazingly, during this entire time, he heard no "fussing," did not see Alton with a baseball bat, and does not remember if Alphonse was even there.
When testifying for the defendant, Ervin presented another version of the events of the evening. According to Ervin, when he and the defendant first arrived at the house, the defendant and Kaisha discussed the ongoing problem with the other three men, and Kaisha told the defendant not to let anyone stop him from seeing his baby. The defendant replied that he would not, but did not do so in a threatening manner.
Ervin testified that when he and the defendant returned after running Joyce's errand, they entered Joyce's house without incident and stayed for five to ten minutes. It was only when they exited the house and were standing outside with Kaisha and the baby that Alton, Alphonse, and Willis appeared. According to Ervin, they came from behind Joyce's house in a darkened area that prevented him from seeing whether they were armed. The three men immediately began directing threatening and insulting language toward he and the defendant who, by then, had started back toward the car.
According to Ervin, Alton approached him from behind and tried to grab him as the defendant was attempting to unlock his car. He testified that he broke away and retreated to the back of the car. It was then that he observed Willis approach Alton from behind and give him the baseball bat. When Alton swung the bat at him, Ervin easily retreated out of range. According *1056 to Ervin, when Alton saw that he would be unable to physically engage him, he turned toward the defendant. Ervin heard Alton say, "What's up Doo?" as he turned to the defendant who was at that time standing next to the open door on the driver's side. Ervin testified that the defendant did not have time to get into the car on the driver's side as Alton approached, and he retreated to the passenger side with Alton in pursuit. The defendant got into the car on the passenger side for an instant and then exited the vehicle. As Alton pursued the defendant to the passenger side, he attempted to swing the bat at the defendant, but, before he could do so, the defendant shot him. Ervin testified that the two men were no more than one foot apart when the defendant fired the gun.
According to Ervin, Alphonse, Willis, and Felton were also approaching the defendant at the same time, but, when they saw what happened, they retreated. Ervin testified that the three remaining men were scrambling around the defendant, who continued shooting. Ervin specifically recalls the defendant shooting at Alphonse.
Dr. Emil M. Laga, a New Iberia pathologist, performed the autopsy on Alton and found no evidence of gun powder in the entry wound. However, according to the doctor, the weapon could have been fired from as little as two feet away without leaving evidence of gunpowder in the entry wound. Christopher Harold Henderson, an expert forensic chemist, considered Dr. Laga's findings as well as his own findings in examining Alton's shirt and concluded that the fatal shot had been fired at a distance between two and six feet.
The various statements given to police officers by the eyewitnesses to the shooting were introduced in evidence by the defendant and further damage their credibility. As an example, none of the witnesses mentioned anything about the baseball bat when interviewed on the night of the shooting. In fact, its existence only came to the attention of the police when it was noticed in the pictures taken of Alton's body lying in Joyce's living room. Before the officers could seize the bat as evidence, it disappeared.
Trinicia finally mentioned the baseball bat in a second interview with the police officers on December 1, 1997. While she stated at trial that Alton made no threatening move toward the defendant before being shot, she made the comment in the second statement that "[Alton] went after [the defendant] with the bat, and [the defendant] just pull [sic] out his gun and shot." She specifically asserted in the second statement that Alton had the bat raised to hit the defendant when he was shot.
Alphonse also failed to mention the baseball bat until his second statement to the police officers taken on December 3, 1997. He told the officers that he did not mention the bat because he was scared that he was "going to jail." When asked why he thought he might be jailed for his participation, he stated, "My brother-in-law had got shot. I felt that we had made a mistake for him getting shooting [sic]. And I thought we was going to jail."
Although she testified at trial that Willis coming to get the baseball bat was what called her attention to the altercation in the first place, Bernice also failed to mention the bat when she gave her statement on the night of the shooting. In fact, she told the investigating officers that someone named Morris Alexander went to her house and told her that the defendant was "shooting." She claimed to have gone to the scene only after the shooting had begun. Still, she told the investigating officers that she saw the defendant shoot Alton. She also placed Demond at the *1057 shooting scene. When asked why she thought the defendant shot Alton, she responded by stating, "I guess he was scared" of "a big dude coming at him." She denied being present at the afternoon altercation.
The portion of the second degree murder statute applicable to this litigation defines the offense as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A)(1). "Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended...." La.R.S. 14:27(A). Thus, to convict the defendant of the second degree murder of Alton, the state had to establish beyond a reasonable doubt that the defendant killed Alton and that he had the specific intent to do so. To convict the defendant of the attempted second degree murder of Felton, the state had to establish beyond a reasonable doubt that the defendant had the specific intent to kill Felton, and that he did an act for the purpose of and tending directly toward accomplishing the act.
The trial court properly instructed the jury concerning the possible responsive verdicts it might return, including manslaughter as defined in La.R.S. 14:31(A)(1), and aggravated battery as defined in La. R.S. 14:34. The jury did not find the defendant guilty of either second degree murder or attempted second degree murder. However, the jury returned the responsive verdicts of manslaughter, for the death of Alton, and aggravated battery, for the shooting of Felton.
On appeal, the defendant asserts that he acted in self-defense. Louisiana law provides that an offender's conduct, which would otherwise be criminal, can be justified if the conduct "is in defense of persons or of property under any of the circumstances described in Articles 19 through 22." La.R.S. 14:18(7). "Articles 19 through 22" refers to La.R.S. 14:19 through La.R.S. 14:22. The pertinent sections of those articles are as follows:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
La.R.S. 14:19.
However, the law does provide justification for even a homicide under certain situations.
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
La.R.S. 14:20.
This statutory justification is not without exceptions.

*1058 A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
La.R.S. 14:21.
It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.
La.R.S. 14:22.
In this case, the state called, as witnesses, five individuals who were at the scene of the shooting. In addition to testifying at trial, each of these individuals gave a statement to the police on the evening of the shooting recounting the evening's events. Subsequently, several gave additional statements, which deviated somewhat from their initial statements, to the police. It is reasonable that multiple people will remember different details of the same occurrence. Likewise, it is reasonable that multiple people will have varying degrees of personal knowledge of the same occurrence. In both instances, the individual accounts would complement each other and fill in the gaps of the other accounts. However, instead of the testimony given at trial by each of the state's witnesses filling in the gaps of the other witnesses' testimony to paint a full picture of the events of the evening of November 26, 1997, the testimonies of each of the state's witnesses is fraught with inconsistencies and conflicts which garble rather than clarify the events of that November evening. Virtually no part of each witness' account of the events can be aligned with another witness' account. Because of the problems within the state's own evidence, all that can reasonably be deduced is that, on the evening of November 26, 1997, the defendant was on a public street in Breaux Bridge, Louisiana, where he had every right to be. He had not instigated any form of disruption. Yet, the defendant was accosted by three men who clearly had every intention of initiating and sustaining an altercation with him and who can best be described as "street thugs" looking for trouble. In fact, these same three men had been involved in an altercation with the defendant earlier in the day and had attempted to cause the defendant physical harm.
Despite the defendant's every effort to avert the apparently imminent altercation, the three men continued to pursue the dispute, the exact nature of which is unclear. Ultimately, the defendant was cornered. He stood face-to-face with a six-foot-seven-inch, 325 pound man armed with a baseball bat. At that point, the defendant's use of force, even deadly force, was justified for his own protection. After firing a shot, the defendant found himself surrounded by a number of individuals and in a perilous situation.
Considering, from the perspective of a rational trier of fact, the whole of the record in a manner most favorable to the state, I do not believe that a rational trier of fact could find the essential elements of the crimes with which the defendant was convicted proven beyond a reasonable doubt. Because I find that the state's evidence has such internal, irreconcilable inconsistencies, leaving little factual evidence upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt, I find the evidence to be insufficient to justify the conviction on each count. Therefore, I would find that the criminal convictions cannot constitutionally *1059 stand and would reverse the convictions.
NOTES
[1] Mr. Francis is also referred to in witness testimony as "Biggie," "Biggie June," and "Heavy."
[2] Testimony was offered indicating that Alton was upset with the defendant due to his treatment of Kaisha, Alton's cousin.
[1] The defendant is also referred to as "Doo" or "Dew" throughout the record.
[2] Alton Francis is also referred to as "Biggie June" or "Heavy" throughout the record.
[3] Joyce Landry is also referred to as "Poopay" throughout the record.
[4] Alphonse Alexander is also referred to as "Boy" throughout the record.
[5] The autopsy report revealed that he was six feet, seven inches tall, and weighed 325 pounds at the time of his death.
[6] This was the same vulgarity involved in the alleged morning incident about which Alphonse testified.
[7] Although not totally clear from the record, it appears that Jacqueline Francis is Alton's mother.