# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-550

**STATE OF LOUISIANA**

**VERSUS**

**KENDALL MILTON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 04K4454D
HONORABLE DONALD W. HEBERT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**MARC T. AMY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Marc T. Amy, and Billy Howard Ezell, Judges.

**AFFIRMED.**

**Earl B. Taylor**
**District Attorney**
**Alisa Ardoin Gothreaux**
**Assistant District Attorney**
**Post Office Drawer 1968**
**Opelousas, LA   70571-1968**
**(337) 948-3041**
**COUNSEL FOR APPELLEE:**
         **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, LA   70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
         **Kendall Milton**

**Kendall Milton**
**Louisiana State Penitentiary**
**C.B.C. Lower Left #16**
**Angola, LA   70712**

AMY, Judge.

On October 14, 2004, at approximately one in the morning, the body of Brian Mallet was discovered at the Pinecrest Loop apartment complex in Sunset, Louisiana. Brian was found lying on the ground next to a gray Dodge Stratus. The police were notified, and although an ambulance was summoned, Brian was dead at the scene.

Based on information provided to the police, the defendant was arrested and charged with Brian's murder. He was indicted by a grand jury on a charge of second degree murder, a violation of La.R.S.14:30.1. Following a jury trial, the defendant was found guilty as charged. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.[1] The defendant appeals, arguing that the evidence is insufficient to support his conviction for second degree murder. For the following reasons, we affirm.

## Discussion

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

*Insufficient Evidence*

The defendant argues that the "jury's credibility assessments are not supported by the testimony and the physical evidence introduced at trial. Therefore, there was insufficient evidence introduced at trial to support a finding that Kendall Milton was guilty of the second degree murder of Brian Mallet."

---

[1] Louisiana Revised Statutes 14:30.1(B) provides: "Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Louisiana Revised Statutes 14:30.1 provides in pertinent part: "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]"

In *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27, a panel of this court explained:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

At trial, the State presented the testimony of three witnesses who claimed that they saw the shooting that morning. The first eyewitness was Geraldine Richard, who resided on Pinecrest Loop. Geraldine testified that around midnight, she and her friend, Judy Meche, were outside on her front porch drinking a bottle of wine. Geraldine stated that she noticed a man, the victim, sitting in what appeared to be a gold car. The car was parked about twenty to thirty feet from her and was across from her apartment. Geraldine testified that sometime later, a white Corsica came from the street behind her apartment, backed up, and parked in front of the gold car, thereby blocking it. According to Geraldine, she recognized some of the occupants of the white car. She remembered that Walter Johnson[2] was the driver and that Ricky Amos

---

[2] Whereas Geraldine testified that the driver of the white car was Walter Johnson, another witness identified the driver as Walter Savoie. Walter Savoie confirmed that he was the driver of the white car.

and Kendall Milton were on the passenger side. Geraldine stated that she did not know the identity of the fourth passenger.

Geraldine testified that Ricky exited the white car, sat in the victim's front passenger seat, and left the door open while they talked. She further testified that: "[S]omebody, Kendall, on the passenger back side, got down. So I said, 'Who's that?' Judy said, 'That's Kendall.' And I heard his voice. Then I knew it was Kendall." According to Geraldine's testimony, the defendant went to the driver's side of the gold car and said, "'N----r, what the f--k?' And all I heard was boom!, and then me and Judy ran in the house."

Upon further questioning, Geraldine stated that she did not recognize the defendant because he had a hood on which did not give her a good view of him. She testified that before he fired the gun, the defendant opened the victim's car door and uttered those words. Geraldine testified that when she and Judy were in her apartment, they heard a second shot.[3] She explained that she did not call the police because she was shaken and panicked.

The State then called Judy Meche to the stand and she, like Geraldine, implicated the defendant in the victim's death. Judy testified that after getting off from work, she arrived at Geraldine's apartment around midnight. She stated that she and Geraldine were on Geraldine's front porch drinking wine. According to Judy, she saw a man sitting in a gold car across from the apartment. Thereafter, a white car passed in front of them and stopped "[a] little bit past the driver of the gold car." Judy testified that Ricky exited the white car and went over to the passenger side of the gold car where he proceeded to talk to the victim through the window. Then,

---

[3] Geraldine opined that this second shot was fired from a different gun because it did not sound as loud as the first shot.

according to Judy, the defendant "[g]ot out of the car and he had a gun in his hand and he approached from the passenger side[4], stuck the gun in the car, and [she] heard the shot." She and Geraldine ran in the apartment where they heard a second shot. Judy testified that when she left Geraldine's house approximately twenty minutes later, no one was outside.

Walter Savoie, Jr. testified that he was driving the white Corsica which belonged to his girlfriend. He stated that Ricky Amos was seated behind him, the defendant was the front passenger, and Wilbert Howard was seated behind the defendant. Walter testified that when he was driving through the apartment complex, he noticed a "dude in a gray car and two women outside[,]" whom he identified as Geraldine and Judy. He stated that when Ricky told him to turn around, he "[p]ulled up in the street, backed up and turned back in the project." After Walter parked the white car in front of the gray car, Ricky went to the passenger side of the gray car to talk to the victim. Walter testified that the defendant then exited the white car and went to the driver's side of the gray car and shot the victim.

Walter testified that after the shot was fired, Ricky jumped out of the gray car and told the defendant not to shoot. Walter stated that he also yelled at the defendant "[t]o don't shoot. Don't shoot the gun no more." When asked what happened next, Walter responded: "It's like he just ain't hear me. He got the dude out [of] the car and Wilbert slapped me on my arm and told me to pull off." According to Walter, when he and Wilbert were leaving the complex, he heard a second shot. Walter stated that he was not able to leave quickly because another vehicle was blocking his path. He testified that because of this, the defendant was able to return to the car. Walter

---

[4] Upon further questioning, Judy clarified the defendant's position by indicating that he went to the driver's side of the victim's car.

4

further testified that when they left the apartment complex, Ricky, who ran down the street after the first shot was fired, reentered the car.

Walter testified that when the defendant reentered the car, the gun was still in his possession. He stated that he asked the defendant where he shot the victim, to which the defendant allegedly replied, "[i]n the shoulder and in the side." According to Walter, he drove to his house where he and his passengers "got out [of] my girlfriend's car and jumped in my truck." After traveling to Lafayette, the men dropped Ricky off at his house in Carencro and then dropped Wilbert off in Sunset. Walter stated that he and the defendant then returned to his house to switch vehicles once again.

Now driving a blue Lincoln Town Car, Walter and the defendant returned to Sunset. Walter testified that they drove "[a]cross the track where the incident happened." Then, they proceeded to a truck stop to get gas. Walter further testified that after he and the defendant exited the Lincoln, a police officer requested that they report to his patrol unit. They complied, and the officers transported them to the Sunset Police Department. Upon the discovery of additional evidence[5], the defendant was charged with second degree murder.

In his brief to this court, the defendant contends that there are "[n]umerous factual contradictions on material facts - facts used to identify the shooter. These inconsistencies or contradictions raise significant reliability problems." The

---

[5] According to Detective Craig Ortego of the St. Landry Parish Sheriff's Office, a subsequent search of the Lincoln yielded a .357 magnum gun with six live .357 caliber hollow-point cartridges in the chamber. Detective Brandon Harris, St. Landry Parish Sheriff's Office, testified that he found three live hollow-point .357 caliber rounds in the back of the patrol unit in which the men were riding. According to Douglas Lancon, a forensic firearms examiner with the Acadiana Crime Lab, testing performed on the bullet fragments that were removed during the victim's autopsy confirmed that the retrieved .357 magnum gun fired that bullet jacket. Winnie Wong, a forensic chemist at the Acadiana Crime Lab, testified that although there was a mixed DNA profile found on both the grips and trigger of the gun, the defendant was determined to be the major DNA contributor.

5

defendant specifically questions as contradictory, the witnesses' testimonies regarding the position of the white Corsica as it may have bearing on "the degree of focus the witnesses had on what was transpiring just before, during and immediately after the shooting" as well as "the identity of the two persons exiting the Corsica and the direction each approached the gray car."

With regard to the positioning of the white Corsica, the record reveals that Geraldine testified as follows:

Q.     And when did you first see that white Corsica?

A.     When it first came in, it came in around from the back way, and then it backed up. It's like the guy's car--

Q.     Okay.

A.     -- was blocked in like.

Q.     Okay. And just to stop you, when you say it came in, did the car enter in the direction in front of you or where did that car, that white Corsica, come from?

A.     It came from like around the apartment and in front of us. Then it backed -- it got to the stop sign, it just backed up by the guy's car.

Judy explained:

Q.     Do you recall what direction the white car came from? Did it enter in?

A.     It entered in, that's all I remember.

Q.     Facing you all where you were sitting? Did it come in the direction that you were in, or did –

A.     Yes.

Q.     -- it come from a different direction?

A.     No, it came in from the direction where we were sitting.

Finally, Walter testified:

Q.    Okay.  And you drove through that area initially?

A.    Yes, Ma'am.

Q.    And you stopped at the stop sign?

A.    Yes, Ma'am.

Q.    And what did you do after you stopped at the stop sign?

A.    Turned around.

Q.    When you say turned around, what did you do?  How did you turn around?

A.    Pulled up in the street, backed up and turned back in the project.

Q.    And where did you go to?

A.    To the dude in the gray car.

Q.    Do you recall where you parked the white Corsica?

A.    In front of them.

Q.    In front of?

A.    The dude in the gray car.

"The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witnesses and is a matter of weight of the evidence and not sufficiency." *State v. Mitchell*, 01-0872, p. 9 (La.App. 3 Cir. 2/13/02), 815 So.2d 1041, 1047, *writ denied*, 02-0785 (La. 11/8/02), 828 So.2d 1110, (*quoting State v. Taylor*, 96-1043, p. 5 (La.App. 3 Cir. 2/5/97), 688 So.2d 1262, 1267).  While the witnesses' testimonies are not particularly specific, we find that they are not so inconsistent that the jury's determination was irrational, "especially in light of its function as a fact-finder and the deference given its credibility determinations[.]" *Id.*

The defendant also argues that there were inconsistencies between Walter and Judy's pre-trial statements and their trial testimony.  He references the fact that when

7

Walter gave a statement to the police on the day of the shooting, he stated that he was in a blue Lincoln Town Car. However, when he gave a second statement four days later, he stated that he was in the white Corsica. At trial, Walter testified that he was, in fact, in the white Corsica at the time of the shooting. He explained that he told the police he was in the Lincoln because he did not want them to take his girlfriend's car.

Judy gave a statement to Chief Deputy Laura Balthazar in the hours following the shooting. In her statement, which was written by the chief deputy, Judy stated that she was in Geraldine's bathroom when she heard gunshots and that: "I came out and saw a black male getting into the drivers' side, I heard his voice it was Kendell [sic] Milton I recognized his voice[.]"

At trial, Judy testified that she and Geraldine were on Geraldine's front porch when the first shot was fired. According to Judy, she did not recall telling the chief deputy that she was in the bathroom at the time of the shooting. Furthermore, she testified that she did not hear the defendant say anything. Judy explained that those assertions were wrongly included in her statement: "It might have got some crossed up. I don't know because I was hysterical."

With regard to inconsistencies between a witness's pre-trial statement and his or her trial testimony, this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir. ), *writ denied*, 605 So.2d 1125 (La.1992):

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

8

Furthermore, the jury may "accept or reject, in whole or in part, the testimony of any witness." *State v. Leger*, 04-1467, p. 19 (La.App. 3 Cir. 6/1/05), 907 So.2d 739, 754, *writ denied*, 05-2263 (La. 4/17/06), 926 So.2d 509, (*quoting State v. Duncan*, 93-1384, p. 8 (La.App. 3 Cir. 4/6/94), 635 So.2d 653, 657, *writ denied*, 94-1067 (La. 10/28/94), 644 So.2d 649).

At trial, defense counsel highlighted inconsistencies between Walter and Judy's pre-trial statements and trial testimony; however, the witnesses were given an opportunity to explain the discrepancies. Because the jury is free to accept or reject this testimony, we will not second guess its ultimate conclusion regarding the witnesses' credibility. *See State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

In a further attempt to discredit the witnesses' testimonies, the defendant relies on the testimony of Dr. Cameron Francis Snider, former regional forensic pathologist at the Lafayette Parish Coroner and Forensic Center, to show the position of the shooter in relation to the victim. Dr. Snider testified that "there was an entrance gunshot wound of the top right sternum area or breastbone area of the body and an exit gunshot wound a little bit lower down on the left side of the back[.]" According to Dr. Snider, this was a contact entrance gunshot wound, meaning that the end of the gun was placed on the victim's clothing when it was fired.

Dr. Snider testified that "the bullet entered from front to back. It traveled from the right side to the left side of the victim's body and it went from upward to downward path through the body." He opined that the shooter held the gun from a position above the victim. In order for this shot to have come from a person standing outside the driver's door, "the victim would have to be turned toward the door to the

9

point almost that the door would be open." Nevertheless, Dr. Snider did not rule out the possibility that the shooter was sitting in the passenger seat of the victim's car. In that scenario, the shooter "would have to reach upward in order to get the same type trajectory as opposed to shooting straight across."

Dr. Snider also found a graze type gunshot wound on the victim's left arm. He hypothesized that "the end of the gun barrel was probably within a foot or a foot and a half away from the [victim's] body[.]" Noting that the arm is movable, Dr. Snider opined that this shot came from the front or left side of the body and traveled from left to right. He agreed with the State's assertion that this graze wound could have occurred if the victim's arm was outstretched toward the front left side, and the shot was fired from the left window area with the bullet coming from left to right. Dr. Snider could not say whether this shot was fired first.

Dr. Snider's report also noted two skin scrapes on the front of the victim's right lower leg. He explained that those injuries were fresh and happened in close proximity with the victim's other injuries, *i.e.*, the gunshot wounds. According to Dr. Snider, the victim's skin scrapes possibly occurred as a result of falling onto concrete.

Given the evidence in the record, we find that the witnesses' testimonies are not irreconcilable with the physical evidence and Dr. Snider's testimony. Walter testified that as the defendant ran to the gray car, he fired the gun. Walter denied defense counsel's assertion that the defendant fired the gun from ten feet away. We recall that Dr. Snider testified that after examining the graze gunshot wound to the victim's arm, he determined that the barrel of the gun may have been fired from as far as a foot and a half away. Walter alleged that after the first shot was fired, the defendant pulled the victim out of the car. Dr. Snider opined that the scrapes to the

victim's leg may have been the result of being pulled down on concrete. We note that the victim was found lying on concrete. Walter maintained that he only heard and did not see the second shot.

Judy testified that she saw the defendant approach the driver's side of the victim's car and shoot him through the window. Although she heard the second shot, she did not see it. A videotape of the crime scene showed that the victim's driver's side window was partially down. Furthermore, the testimony of Dr. Snider indicated that if a shot came from the left window and the victim's arm was outstretched, that could cause a graze gunshot wound.

According to Geraldine's testimony, the defendant went to the driver's side of the victim's car, opened the door, and then shot the victim. She also did not see the second shot. Once again, this factual scenario does not contradict Dr. Snider's testimony. Dr. Snider testified that the shot to the victim's sternum was a contact wound. Dr. Snider opined that one way this wound could have occurred is if the shooter was outside the driver's door and "the victim would have to be turned toward the door to the point almost that the door would be open."

After a review of the record, we find that there is sufficient evidence to support the defendant's conviction. Although there may be inconsistencies between and in the witnesses' testimonies, the fact remains that all three eyewitnesses identified the defendant as the person who shot and killed the victim. Furthermore, the witnesses' testimonies are not refuted by the physical evidence. When we examine the evidence in the light most favorable to the prosecution, we determine that a rational trier of fact could have found the defendant guilty of second degree murder.

## DECREE

For the foregoing reasons, the defendant's conviction is affirmed.

**AFFIRMED.**