744 So.2d 694 (1999)
STATE of Louisiana, Appellee,
v.
James Ray LOUIS, Appellant.
No. 32,347-KA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1999.
*696 Louisiana Appellate Project by Peggy J. Sullivan, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, David Peterson, Catherine M. Estopinal, Asst. Dist. Attys., Counsel for Appellee.
Before WILLIAMS, CARAWAY & PEATROSS, JJ.
*697 PEATROSS, J.
Defendant, James Ray Louis, was charged with and convicted of first degree robbery, in violation of La. R.S. 14:64.1. He was then billed as a multiple offender. Following a hearing in which the trial court determined that Defendant was a third violent felony offender, he was sentenced to life imprisonment at hard labor, without the benefit of parole, probation or suspension of sentence. Defendant appeals, asserting the following six assignments of error: (1) the trial court erred in denying the motion to suppress the photographic line-up, which was unduly suggestive; (2) the evidence adduced at trial was insufficient to support a conviction of first degree robbery; (3) the trial court erred in adjudicating the defendant a third felony offender; (4) the sentence imposed was harsh and excessive under the facts and circumstances of this case; (5) the trial court erred in imposing sentence without adequately considering the factors set forth in LSA-C.Cr.P. article 894.1; and (6) trial counsel was ineffective insofar as he failed to file a motion to reconsider sentence. For the reasons set forth herein, Defendant's conviction and sentence are affirmed.

FACTS
Defendant was accused of robbing Tri-State Bank & Trust on Youree Drive in Shreveport, Louisiana, on April 24, 1997. Approximately $5,120 was taken during the robbery. The first witness to testify at the trial of this matter was Sharon Marsailes. Ms. Marsailes was the teller who was robbed during the course of these events. She testified that at the time the robber originally entered the bank (between 9:15-9:30 a.m.), she and Barbara Goodwin, another teller, were the only tellers at the front counter. They were both on the telephone, but heard the door open and turned to see who had entered the bank. At first, they did not see anyone.
Ms. Marsailes then completed her telephone call and as she turned around, she saw a black male enter the lobby area. He went first to Ms. Goodwin's window, but because Ms. Goodwin was still on the telephone with a customer, Ms. Marsailes asked if she could help him. The man walked over to Ms. Marsailes' window and handed her a note written on a white envelope which read, "I have a gun fill the bag."
After reading the note, Ms. Marsailes asked the man, "with what?" He responded, "hundreds." At this time, Ms. Marsailes pushed the alarm button which activated the silent alarm and the security cameras. The robber then put a sack on the counter and Ms. Marsailes began to put hundreds into the sack from her cash drawer. He saw that she also had a lot of twenties so he told her, "some of those, hurry," referring to the twenties. After she gave him the money, the robber took the paper sack and walked out of the bank. Ms. Marsailes never saw a gun, but presumed that he had one because she believed what the robber had written on the note.
Ms. Marsailes gave the following description of the robber to police: black male, five-foot-six, scrawny, mediumskinned, approximately 20 to 25 years old, thin mustache, wearing a red jumpsuit and a black nylon cap that covered his hair, hands did not have gloves and the jumpsuit was not tight fitting. In court, Ms. Marsailes identified Defendant as the person who had robbed her. She also testified that she had previously identified Defendant as the robber in a photographic line-up presented to her by the police shortly after the robbery.
The next witness to testify was the other bank teller, Ms. Goodwin. She gave the same version of the events of the robbery as did Ms. Marsailes. Ms. Goodwin testified that, at first, she was not in the direct line of sight of Ms. Marsailes and the robber. She got suspicious, however, when she heard Ms. Marsailes, after having read the note, ask the man, "with *698 what?" Ms. Goodwin then realized that they were being robbed and hit the alarm, which sent a silent signal to the police and activated the security cameras. Though she never actually saw a weapon, Ms. Goodwin believed that the robber had one and that it was located below the window where she could not see it.
Ms. Goodwin also identified the Defendant, in court, as the person who robbed the Tri-State Bank. She testified that she, too, had identified Defendant as the robber in a photographic line-up presented to her by the police shortly after the robbery.
The next two witnesses, Virgil Teufel and Sybil Hines, lived in the neighborhood behind the bank and had noticed a black male riding a bicycle after the robbery. Mr. Teufel, who resided in the 200 block of Carrollton, had no specific information other than the fact that he saw a black man dressed in red, riding a bicycle in the neighborhood. Ms. Hines, who resided in the 200 block of Leo, saw a black person ride by her home on a bicycle and throw a brown paper sack on the ground. When Ms. Hines saw this person, he was wearing dark clothes, not a red jumpsuit.
Another eyewitness, Kathy Horn, worked in the same complex as the bank. As she was coming to work that morning, she saw someone coming out of the bank. As she turned into the complex from Youree Drive and started to enter the driveway, she saw the same person, a black male dressed in a red jumpsuit, begin to run away from the bank and into the neighborhood located behind it. Neither Ms. Horn, Mr. Teufel nor Ms. Hines were able, after viewing this person, to identify him.
The next witness to testify was Mary Morgan, Defendant's ex-girlfriend. She gave no pertinent information during her testimony and refused to identify the person in the still photograph taken from the bank security camera as Defendant. She did identify the picture of the bicycle that the prosecution alleged Defendant rode to and away from the robbery as her brother's bike.
The prosecution then called to testify all seven police officers who were involved in this investigation. The first was Officer David K. Goodwin, the son of Ms. Goodwin, one of the bank tellers. Officer Goodwin testified that a call was received and he went to the bank and began to look for the suspect. He found a red jumpsuit lying next to a wooden fence in the 1500 block of Grover Street. Officer Goodwin then continued to search the remainder of Grover Street in a northbound direction; and, in the middle of the road, less than one block from where the jumpsuit was found, at the next corner, in the 1400 block of Leo, Officer Goodwin found the paper bag. Finally, at 292 Carrollton, in front of the house, on the sidewalk, Officer Goodwin found a black satin "do-rag" or rag that some people wear on their heads to cover hair.
All of these items were photographed and collected by Officer D.K. Duddy, the next police officer to testify. Officer Duddy then went to the scene of the crime and photographed the interior and exterior of the bank. When he completed this task, he and Officer David Kent dusted the area for fingerprints. Officer Duddy was able to lift fingerprints from the counter area and from the inside of the front door; however, they were unable to match these fingerprints to Defendant. Finally, Officer Duddy collected and cataloged, as evidence, the note written by the robber.
Officer D.B. Kent testified that he assisted in the collection of fingerprints. After completion of this task, he collected the film from the security cameras and took it to the processing lab at 59 Minute Photo Supply.
Officer D.L. Glover was the next officer to testify. Officer Glover was dispatched to the scene, called for support and secured the area. He took the description of the suspect from the bank tellers. Officer Glover testified that the same description *699 was given by both Ms. Marsailes and Ms. Goodwin.
Detective H.D. Malone was also called to the scene. Detective Malone testified that he proceeded door to door through the neighborhood following the apparent route that the robber took when he fled the bank. Detective Malone then went to the photo processing lab and picked up the photos developed from the security camera film. Detective Malone then had the photo of the suspect broadcast on television in the hopes that someone would be able to identify him. After airing the photograph, the police received a tip that Defendant was the robber.
Officer D.B. Fuselier was involved in the arrest of Defendant. After obtaining information that Defendant was possibly staying at 3517 Pleasant Drive, he went to the location, surveilled it and observed an individual who resembled Defendant. Officer Fuselier made contact with the people living in the home. He met Mary Morgan, Defendant's ex-girlfriend, and asked if Defendant was present in the home. She indicated that he was and the officers then found Defendant hiding underneath a bed in the rear of the home and arrested him.
After Defendant was arrested, Detective Malone constructed a computer generated photographic line-up, using a recent photograph of Defendant and six other black males with similar features, to show Ms. Marsailes and Ms. Goodwin. Ms. Marsailes saw the line-up first, on a Friday, and was able to pick out Defendant in less than 30 seconds. Detective Malone returned to the bank the following Monday and had Ms. Goodwin view the line-up. She also identified Defendant as the person who had robbed Tri-State Bank.
The final prosecution witness was Detective Clarence Wray. Detective Wray interviewed Ms. Marsailes and Ms. Goodwin and then located witnesses Mr. Teufel and Ms. Hines. Detective Wray also interviewed Defendant on April 30, 1997. At that time, Defendant told Detective Wray that he had no comment. Detective Wray then re-interviewed Defendant on May 1, 1997, and Defendant denied ever going to Tri-State Bank and claimed that he was unable to recognize the person in the photos from the security cameras.
Perhaps most importantly, Detective Wray testified about his interview with Mary Morgan. He was able to impeach her testimony by telling the jury that, when the security camera photograph was originally shown to Ms. Morgan, she was able to positively identify the person in the photograph as Defendant.
Defendant elected not to present any witnesses. The jury convicted Defendant of first degree robbery. Defendant was then billed a third violent felony offender. The first was for simple robbery, which was committed on December 27, 1988, to which Defendant pled guilty on July 16, 1990, in Docket No. 143,996, First Judicial District Court. The second felony conviction was for simple burglary of an inhabited dwelling, which was committed on September 21, 1990, to which Defendant pled guilty on March 8, 1991, in Docket No. 151,813-B, First Judicial District Court. The third was the instant offense.
Following a multiple offender hearing held on August 31, 1998, Defendant was adjudged a third felony offender and was sentenced, on September 9, 1998, to life imprisonment without the benefit of parole, probation or suspension of sentence. This appeal followed.

DISCUSSION
Assignment of error number 2: The evidence adduced at trial was insufficient to support a conviction of first degree robbery.
When a defendant challenges the sufficiency of the evidence and one or more trial errors, the reviewing court will consider the former, as a finding of insufficient evidence will moot the trial errors. State v. Hearold, 603 So.2d 731 (La.1992); *700 State v. Adams, 30,815 (La.App.2d Cir.6/24/98), 715 So.2d 118, writ denied, 98-2031 (La.3/19/99), 739 So.2d 774. The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984); State v. Morris, 521 So.2d 1214 (La.App. 2d Cir. 1988), writ denied, 530 So.2d 80 (La.1988). The Jackson standard, however, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess credibility or re-weigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient to support the requisite factual finding. State v. Gradick, 29,231 (La.App.2d Cir.1/22/97), 687 So.2d 1071; State v. Braswell, 605 So.2d 702 (La.App. 2d Cir.1992); Positive identification by one witness may be sufficient to support the conviction. State v. White, 28,095 (La.App.2d Cir.5/08/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760.
La. R.S. 14:64.1 defines first degree robbery and provides as follows:
First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon.
Defendant contends that he was not the person who robbed the bank and that the State failed to prove its case beyond a reasonable doubt because the only evidence it had was the identification made by the bank tellers. In cases involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the State to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Long, 408 So.2d 1221 (La.1982); State v. Chism, 591 So.2d 383 (La.App. 2d Cir.1991).
As noted above, assessment of the credibility of witnesses is a function of the trier of fact, in which judge or jury has great discretion. State v. Trosclair, 443 So.2d 1098 (La.1983), U.S. cert. dismissed, 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984); State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied, 567 So.2d 93 (La.1990). Both Ms. Marsailes and Ms. Goodwin testified that they saw Defendant and that they were able to identify him from the photographs the police brought into the bank. It is clear that the jury believed their testimony and their identifications. Moreover, Detective Malone testified that Ms. Morgan, when Defendant was not present, positively identified the person in the photograph taken by the security camera as Defendant. Viewed in the light most favorable to the State, this evidence sufficiently negates any reasonable probability of misidentification and permits a finding of guilty. La. C.Cr.P. art. 821; Jackson v. Virginia, supra. This assignment is without merit.
Assignment of error number 1: The trial court erred in denying the motion to suppress the photographic line-up, which was unduly suggestive.
Defendant contends that the trial court erred when it denied his motion to suppress the out-of-court identification. He argues that the line-up procedure was suggestive because in the six photographs presented to Ms. Marsailes and Ms. Goodwin, only Defendant was dressed in an orange prison jumpsuit.
When reviewing an out-of-court identification procedure for its constitutionality *701 and its consequent admissibility, the court must first make a determination of whether the police used an impermissibly suggestive procedure in obtaining the out-of-court identification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Valentine, 570 So.2d 533 (La.App. 4th Cir.1990). If the court finds in the affirmative, the court must then decide, under all the circumstances, if the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. Manson, supra; State v. Prudholm, supra; State v. McPherson, 630 So.2d 935 (La.App. 4th Cir.1993); State v. Valentine, supra.
A photographic lineup may be overly suggestive if the photographs display a defendant so singularly that a witness' attention is unduly focused upon that defendant. However, even if the identification were made from a suggestive lineup, a conviction will not be reversed if the identification is otherwise reliable. State v. Prudholm, supra; State v. McPherson, supra; State v. Flank, 537 So.2d 236 (La. App. 4th Cir.1988). In Manson, the Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.
A hearing on the motion to suppress was held on August 4, 1998. Detectives Wray and Malone, the officers who constructed the photographic line-ups, testified. Detective Wray testified first and gave the following description of how the line-ups in this matter were generated:
AFIS has, contains all of the jail photos from around the state. It's a statewide operating system. We are able to go in there and by inserting characteristics, facial characteristics that type of information, we are able to pull up candidates and put those candidates into a line-up, trying to match the facial characteristics to the suspect.
Detective Wray then testified that they took one of the line-ups to the bank and had both tellers view it separately. The tellers were told that the suspect may or may not be in the line-up and that they were to consider the facial features of each of the individuals before making a decision because things such as hair styles, facial hair and clothes were subject to change. It took Ms. Marsailes less than 30 seconds to pick out Defendant from the lineup and it took Ms. Goodwin about the same length of time to also pick out Defendant from of the line-up.
Based on this testimony, it does not appear that the photographic line-up procedure was unduly suggestive. The trial court, which had the opportunity to view the line-up, apparently felt it was not unduly suggestive because Defendant's motion was denied. Even if it was suggestive, however, under the factors outlined in Manson v. Brathwaite, supra, the identification appears reliable. The robbery occurred in the bank during the morning hours. Ms. Marsailes stated that the robber initially went to Ms. Goodwin's window and waited there until she asked if she could help him. Then he came to Ms. Marsailes' window and gave her the note stating that he had a gun and wanted money. The robber then put a bag on the counter and waited until Ms. Marsailes put the hundreds in the bag. He then asked for twenties and waited for her to put those in the bag.
During this exchange, both Ms. Marsailes and Ms. Goodwin, who apparently noticed that something was not right with this transaction, had an ample opportunity to view the robber. There is nothing in the record that would suggest that either Ms. Marsailes or Ms. Goodwin chose Defendant as the suspect because of his clothing. Further, there was additional photographic *702 evidence from the video cameras which both Ms. Marsailes and Ms. Goodwin activated by pushing the silent alarm. Finally, the photographic line-up was presented to Ms. Marsailes and Ms. Goodwin approximately one week after the robbery, and both of them were positive in their identifications. This assignment of error lacks merit.
Assignment of error number 3: The trial court erred in adjudicating Defendant a third felony offender.
Defendant now complains that the trial court failed to sufficiently inquire into the background of all of his prior guilty pleas to ensure that each was properly taken such that they were able to be used for enhancement purposes. La. R.S. 15:529.1(D)(1)(b) provides the procedure that must be followed by a defendant challenging prior convictions that the prosecution intends to use for enhancement in multiple offender proceedings:
(b) Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor. A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
Defendant contends that the evidence presented by the State fails to prove that the predicate offenses are constitutionally valid for purposes of his habitual offender proceeding. As noted above, La. R.S. 15:529.1 D(1) governs the procedure for preserving these issues on appeal. The procedure requires the court in which the subsequent conviction was obtained to bring the offender before the court, inform him of the allegations contained in the information and of his rights and require the offender to say whether the allegations are true. If the offender denies the allegation, refuses to answer or remains silent, his plea or the fact of his silence is entered on the record and he shall be given 15 days to file particular objections to the information. Any challenge to the previous conviction or adjudication of delinquency not made before sentence is imposed may not thereafter be raised to attack the sentence. La. R.S. 15:529.1(D)(1)(b).
In order to challenge the validity of any of his prior convictions, Defendant was required to file, within 15 days of arraignment, a written response denying the allegations set forth in the bill of information. Defendant neither filed a written response nor objected at the hearing to the introduction into evidence of the State's exhibits. Since he failed to comply with the statute, Defendant is barred from directly attacking the validity of prior offenses on appeal. This assignment of error lacks merit.
Assignment of error number 4: The sentence imposed was harsh and excessive under the facts and circumstances of this case.
Assignment of error number 5: The trial court erred in imposing sentence without adequately considering the factors set forth in La. R.S.C.Cr.P. article 894.1.
Defendant's trial counsel failed to either object to the sentence at the time of sentencing, or to file a motion to reconsider *703 sentence thereafter. When a defendant fails to file a motion to reconsider sentence under La.C.Cr.P. art. 881.1, the appellate court's review is limited to the bare claim that the sentence is constitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La.App.2d Cir.2/25/98), 707 So.2d 164. Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992).
Defendant contends that even when there is a mandatory minimum sentence, the trial court still has discretion to impose a lesser sentence if the facts and circumstances warrant it. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. He argues that the trial court did not order a pre-sentence investigation report and failed to state for the record any factual basis for sentence as required by La. C.Cr.P. art. 894.1. Defendant, therefore, requests a remand for re-sentencing.
The Habitual Offender Law, La. R.S. 15:529.1, has been held to be constitutional in its entirety; the mandatory minimum sentences provided therein are, therefore, presumed to be constitutional. Johnson, supra. The sentencing court may deviate downward only when it finds that the mandatory minimum makes no measurable contribution to acceptable goals of punishment, or is nothing more than purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime. State v. Dorthey, supra. Defendant bears the burden of showing that a deviation beneath the mandatory minimum is warranted. Johnson, supra.
La. R.S. 15:529.1 A(1)(b)(ii) prescribes mandatory life without benefit "if the third felony or either of the two prior felonies is a felony defined as a crime of violence under La. R.S. 14:2(13)." Section 2(13) states, in part, "[t]he following enumerated offenses are included as `crimes of violence': * * * (x) First degree robbery, (y) Simple robbery." The trial court found that the State met its burden of proof that one of Defendant's prior felonies, simple robbery, as well as the instant conviction, first degree robbery, are defined as "crimes of violence" under La. R.S. 14:2(13), thus activating the mandatory life at hard labor provision of La. R.S. 15:529.1 A(1)(b)(ii). Defense counsel argued only that Defendant had a drug problem and that none of the crimes he committed had hurt or affected a person or individual. Under the circumstances of the instant case, life at hard labor and without benefit, for this offense and offender, does not shock our sense of justice. The assignment of error lacks merit.
Assignment of error number 6: The trial counsel was ineffective insofar as he failed to file a motion to reconsider sentence.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post-conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, supra. Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Ratcliff, 416 So.2d 528 (La.1982).
Defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). Defendant must show that counsel's performance was deficient and that the deficiency prejudiced Defendant. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to Defendant by the Sixth Amendment. Strickland, supra. Counsel's deficient performance will have prejudiced Defendant if he shows that the errors were so *704 serious as to deprive him of a fair trial. To carry his burden, Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra. Defendant must make both showings to prove that counsel was so ineffective as to require reversal.
Failure to file a motion to reconsider sentence does not in itself constitute ineffective assistance of counsel. If, however, Defendant can "show a reasonable probability that, but for counsel's error, his sentence would have been different," a basis for an ineffective assistance claim may be found. State v. Pendelton, 96-367 (La. App. 5th Cir.5/28/97), 696 So.2d 144.
Defendant was adjudged a habitual offender pursuant to La. R.S. 15:529.1. He failed to object to any of the predicate offenses. His lawyer failed to make any compelling argument which would justify a deviation from the mandatory sentencing guidelines found in La. R.S. 15:529.1. This assignment is without merit.

CONCLUSION
For the foregoing reasons, Defendant's conviction and sentence are affirmed.
AFFIRMED.