NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-250

STATE OF LOUISIANA

VERSUS

KEVIN NARCISSE

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 06-705
HONORABLE JOHN E. CONERY, PRESIDING
\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and Billy H. Ezell, Judges.

AFFIRMED

Jeffrey J. Trosclair
Assistant District Attorney
St Mary Parish Courthouse
Franklin, LA 70538
(337) 828-4100 Ext. 550

COUNSEL FOR APPELLEE:
        State of Louisiana

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA 70602-1641
(318) 491-0570
COUNSEL FOR DEFENDANT-APPELLANT:
        Kevin Narcisse

**COOKS, Judge.**

## STATEMENT OF THE FACTS

On January 8, 2006, Robert West and three friends, Shawn Broussard, Jacobe Villery, and Vanity Archangel (West's fiancee), were driving around New Iberia in search of five dollars worth of marijuana. At the corner of Ann and Sam Streets, they encountered several people. When they pulled the car up to the curb, Brandon "B"Augustine approached the car, and Villery, who was familiar with Augustine from high school, told him they wanted to buy some marijuana. Augustine took five dollars from Villery, walked over to Defendant, Kevin Narcisse, and gave him the money. Defendant returned to the car and gave Villery a small bag of marijuana. An argument ensued between Defendant and the victim, Mr. West, who was a passenger in the car, over the quantity of marijuana. Mr. West got out of the car to confront Defendant but instead faced a gun. As he was attempting to flee, Defendant shot him six times, five times in the back and once in the back of his arm. The victim died as a result of the gunshot wounds. Defendant ran from the scene but eventually surrendered himself six weeks later.

Defendant was indicted by a grand jury on April 25, 2006, for first degree murder. On December 19, 2006, the charge was amended by bill of information to second degree murder, a violation of La.R.S. 14:30.1. Defendant filed a "Motion to Suppress Identifications" in November 2006. Hearings were held on the motion on April 17, 2007, and May 23, 2007. The motion was denied in open court, and on July 12, 2007, the trial court submitted written reasons for the denial.

Trial commenced on August 13, 2007, then was continued to and completed on August 17, 2007. The jury returned a verdict of guilty of second degree murder. Defendant then filed a "Motion for Post Judgment of Acquittal" and "Motion for New Trial." The "Motion for Post Judgement of Acquittal" was denied without a

hearing. The hearing on the "Motion for New Trial" was held on September 10, 2007, and denied on the same date in open court. Defendant was sentenced on September 11, 2007, to life imprisonment without the benefit of parole, probation, or suspension of sentence.

Defendant has now perfected a timely appeal alleging four assignments of error: 1) The photographic line-ups were unduly suggestive and conducted improperly; 2) The verdict of the jury was contrary to the law and evidence as there was insufficient evidence to sustain the verdict of second degree murder; 3) The trial court erred when it denied Defendant's "Motion for New Trial"; 4) The trial court erred when it denied Defendant's challenge for cause regarding the prospective juror, Irving Thomas. On July 18, 2008, Defendant filed a *pro-se* supplemental brief alleging as errors insufficient evidence, improper photographic line-up procedure, and that the trial court erred when it denied his motion for a mistrial.

## LAW AND DISCUSSION

### *ASSIGNMENT OF ERROR NUMBER ONE*.

Defendant contends that the trial court erred when it denied his motion to suppress the evidence asserting the photographic line-up was unduly suggestive in that the witnesses' attentions were unduly focused on him. He also asserts proper procedures for viewing a line-up were not followed by the officers, which affected the reliability of the identification of Defendant as the shooter. Defendant also asserts the witnesses' descriptions of the shooter were only "as having short dread locks and a red jacket or red hooded sweatshirt" and that no witness described any facial features of Defendant.

In *State v. Broadway,* 96-2659, p. 14 (La. 10/19/99), 753 So.2d 801, 812, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000), the supreme court stated:

3

The defendant has the burden of proof on a motion to suppress an out-of-court identification. La.Code Crim. Proc. art. 703D. To suppress an identification, the defendant must first prove that the identification procedure was suggestive. *State v. Prudholm*, 446 So.2d 729 (La.1984). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. *State v. Robinson*, 386 So.2d 1374, 1377 (La.1980). However, even when suggestiveness of the identification process is proved by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure. *State v. Prudholm, supra*.

In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court held that an identification may be permissible, despite the existence of a suggestive pretrial identification, if there does not exist a "very substantial likelihood of irreparable misidentification." The factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Id.* at 114, 97 S.Ct. 2243.

Scott Hotard, a detective with the Iberia Parish Sheriff's Office, was the supervisor of the investigation. He stated based on the witnesses' descriptions of the shooter, the police requested a photographic line-up from Automated Fingerprint Identification Services (AFIS), which included a picture of Defendant. However, the picture they received from AFIS of Defendant did not look like Defendant, and none of the pictures included men with dreadlocks. The detective then went through pictures that were on file at the police station and picked out five other pictures of young, fair-skinned, African American males, with "dread" hair types so as to present a six-person photographic line-up, which would not single out the Defendant.

From the description of the shooter given to him by three eyewitnesses, namely Villery, Broussard, and Archangel, Detective Hotard put together a photographic line-up. He included a picture of Defendant that he had in one of his files. He also included pictures of other light skinned African American males, as Defendant had

4

been described as such, and included one person who was also wearing red. The detective had an encounter with Defendant a few weeks earlier, and he believed Defendant fit the description of the shooter given by the eyewitnesses. At the motion to suppress hearing, two detectives, Hotard and Donald Lasher testified they conducted the interviews of the witnesses and provided them with the photographic line-ups.

Archangel testified at the suppression hearing she watched Defendant when he was on both sides of the car. After the shooting, she told the police the shooter was an African American male, fair-skinned, and wore a red jacket with a hood. She testified she took time to consider each photograph when she was given the photographs. She stated she picked photograph number four and told the detective, "I was almost positively sure that that was the guy who shot my boyfriend." The witness further testified she took her time viewing the photographs because she wanted to be sure. She stated it was daylight when she saw the shooter from an arm's length away. It was approximately six hours after the shooting when she identified Defendant as the shooter in the photographic lineup.

Broussard testified he was very certain the person he picked out of the line-up was the shooter. He, too, viewed the photographic line-up within five to six hours after the shooting. Broussard said he clearly saw Defendant's face when he leaned into the car to put a little more marijuana into the bag. When he was shown the line-up, it did not take him very long to pick out who he believed was the shooter and when asked what it was about the person he picked that looked like the shooter, he stated, "Everything. His face." He stated he had an unobstructed view of Defendant's face when he leaned into the car to argue with Villery and then when Defendant put a little more marijuana into the bag that Villery was holding.

5

Villery testified, as noted above, that although he saw the red shirt and noted that the shooter had dreadlocks, he could not be certain of the shooter's identity; however, he did state after viewing the pictures he told a person with the Sheriff's Office that photograph number one (Defendant's picture) looked like the shooter.

Defendant argues the detectives used an improper procedure which compounded the suggestiveness of the photographic line-up. He contends the procedure used by authorities for the photographic line-up was not the suggested procedure noted in the United States Department of Justice guidelines. Defendant asserts that Detective Lasher was unaware, having never read the Department of Justice guidelines, that he should tell the witness the suspect may not be in the line-up. He asserts Detective Lasher improperly told Broussard the shooter had been identified and was among the pictures shown to him in the line-up. Detective Lasher denied he told the witness a picture of the shooter was included with the photographs. The following testimony of Detective Lasher was taken at the suppression hearing:

> BY MS. BONIN:
> Q. Right. So in the DVD when you say "Someone had I.D.'d the suspect and we have a line-up with him in it.", then you must be reporting what Detective Hotard told you.
>
> A. Ms. Bonin, I never told Mr. Villery or Mr. Broussard, okay, that a photo line-up was used and a person was I.D.'d in the photo line-up. I said a person was I.D.'d, which in my terminology means that a suspect possibly named.
>
> Q. Where did you get line-ups because "We have a possible I.D. on who this dude might be, but we're gonna need y'all's help. Whenever they get there, we are going to show him to you and we are going to let you pick him out."
>
> A. Okay.
>
> Q. Now doesn't [this] tell them that a suspect has been I.D.'d and he is in the line-up?
>
> A. No ma'am. I did not say that.

Q. Well, I am telling you what the DVD says. I am just--It has been transcribed. That is all right.

BY MR. ODINET:

The DVD speaks for itself, Your Honor.

At the suppression hearing, Archangel stated that Detective Hotard told her he was going to show her some pictures. She testified as follows:

Q. Did the person who was instructing you on the photo line-up tell you that it was just as important to clear innocent people as it was to show the person who was in fact a suspect?

A. I don't remember all the conversations we had I just remember him telling me that there was going to be a photo line-up and me having to pick someone. That is it.

Q. I'm sorry. I didn't hear that last part?

A. The fact that I had to do a photo line-up. Pick somebody on the paper if I seen that person.

Q. Okay.

    BY THE COURT:

        Well, that is not what I heard her say. I heard her say that the officer told her he was going to present her with photo line-up so that she could pick someone.

BY THE WITNESS:

A. Right.

    BY THE COURT:

        Is that what you said? Or did I misunderstand you?

    BY MS. BONIN:

        You mean before? In her first testimony?

7

BY THE COURT:

Just now.

BY THE WITNESS:

A. Yes.

BY MS. BONIN: (Continuing)

Q. Which one is it?

A. He told --I am so lost right now. I'm sorry. He told me basically there was going to be a photo line-up and I had to-- either there was going to be the person on there that I saw kill my boyfriend or he wasn't going to be on there.

At the suppression hearing, Broussard recalled what he was told by the

detective regarding the line-up:

Q. Before they showed you those pictures, did you they--do you remember the person interviewing you say that they were ". . .waiting to get the photo line-ups because we have a possible I.D. on who this dude might be; but we're gonna need your help. Okay? Whenever they get here, we are going to show them to you and we are gonna let you pick him." Do you remember that?

A. No ma'am.

Q. Okay. When the photographs did get there, were you told that it was just as important in photo line-up to clear the innocent as it was to point out the guilty?

A. Yes ma'am.

Q. They told you that?

A. (Nods "yes".)

Q. And did they tell you that maybe the person doesn't appear exactly the same in the photograph which may have been taken another today as today he would have appeared?

A. No ma'am.

Q. Did they tell you that suspect may or may not be in the photo line-up?

A. Yes ma'am.

Q. Did they tell you that whether you identified somebody or did not identify somebody that the investigation was going to keep going on?

A. Yes ma'am.

Following the continuation of the suppression hearing on May 23, 2007, and the testimonies of Detectives Lasher and Hotard, the trial court denied the Motion To Suppress, stating that "there are multiple cases on point that indicates that, even though the Justice Department guidelines are not followed, the photo I.D. can be reliable. It is up to the defendant to prove that they are not."

In its "Reasons for Judgment on the Motions to Suppress," the trial court specifically found that the picture of Defendant wearing a red sweatshirt was not unduly suggestive. The trial court stated:

> At the hearing on May 23, 2007, Detective Hotard testified that he took photographs of every one that he interviewed. However, he could only find two pictures of black males who had dreadlocks and who were also wearing red. So, he put both of them in the line up. According to Mr. Hotard he believed that all of the persons in the line up had similar features, similar hair, and were fairly close in skin tone. Mr. Hotard further testified that other than the AFIS picture, the picture used was the only picture of Kevin Narcisse.

In its reasons for judgment, the trial court cited *State v. Brown,* 03-0897 (La. 4/12/05), 907 So.2d 1, *State v. McSpaddin,* 341 So.2d 868 (La.1977), and *State v. Cotton,* 511 So.2d 1207 (La.App. 2 Cir. 1987) to support its denial of the motion. In *Brown,* the accused had only one eye. He claimed the line-up was unduly suggestive, since he was the only one having a missing eye. The supreme court found, based on the totality of the circumstances, there was not a substantial likelihood of misidentification, stating:

> Further, when viewing the photographic lineup itself, it is clear that the State sought fill-in subjects with vision problems. One subject's left eye is clouded white and appears to be blind. Another appears to have a lazy eye. While one photograph depicts a man with no apparent ocular difficulties, the two remaining subjects appear to be droopy-eyed

9

> as though under the influence of drugs or alcohol. In addition, all of the other subjects have comparable hairstyles, skin tone and facial hair to defendant.

*Brown,* 907 So.2d at 20. In *Cotton*, the accused challenged the photographic line-up because he was the only person in the line-up wearing a striped shirt similar to the one the witness reported that the perpetrator had worn when he committed the crime. The second circuit did not find the line-up unduly suggestive for that reason. The other individuals in the line-up were "of similar height, weight, age and appearance. . . . Also, there is nothing in the record to indicate that, in making his identification, Mr. Banks focused on the clothing worn by the defendant rather than his overall physical appearance." *Cotton,* 511 So.2d at 1212. Finally, in *McSpaddin,* the accused asserted the line-up was unduly suggestive because there were only two blond haired individuals, and he was a blond. The supreme court found that "[a] study of the photographs discloses no striking characteristic of McSpaddin which would unduly suggest to the victim that he was the robber. Natural differences were of course apparent, but there were type similarities which support the State's position that there was no intention to create undue suggestion." *McSpaddin,* 341 So.2d at 871.

"A line-up is also suggestive if there is not a sufficient resemblance of characteristics and features of the persons in the line-up. Strict identity of physical characteristics among the persons in the photographic lineup is not required. All that is required is a sufficient resemblance to reasonably test the identification." *State v. Washington*, 00-1312, p. 15 (La. App. 5 Cir. 5/16/01), 788 So.2d 596, 605-606, *writ denied*, 01-1718 (La. 5/03/02), 815 So.2d 94 (citations omitted). While only two of the individuals in the line-up were shown wearing red, it does not appear Defendant was picked because of his clothing. All of the individuals had similar skin color and

facial features, and all had dreadlocks of various lengths. Broussard testified that the shooter's dreadlocks were about two inches long. In the photographic line-up the second individual wearing red had dreadlocks approximately two to three inches long, while Defendant's dreadlocks appeared to be much shorter. Both witnesses who identified Defendant within six hours after seeing him were positive of their identifications. In *State v. Louis*, 32,347 (La.App. 2 Cir. 10/27/99), 744 So.2d 694, Louis argued the photographic line-up was unduly suggestive because he was the only individual wearing an orange prison jumpsuit. The second circuit disagreed, stating that even if the photograph was suggestive, under the factors outlined in *Manson v. Brathwaite,* 432 U.S. 98, the identification appeared reliable.

In the current case, the witnesses had a clear view of the accused and were positive in their identifications. "The question for a reviewing court is to determine whether the procedure is so conducive to irreparable misidentification that due process was denied." *State v. Bright*, 98-398, p. 17 (La. 4/11/00), 776 So.2d 1134, 1144. A review of the record herein indicates there was no intention to create undue suggestion and there was little likelihood of a misidentification.

### *ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE*.

Defendant argues the evidence was insufficient to sustain the verdict of second degree murder. Additionally, he contends that the trial court erred when it denied his "Motion for New Trial," which was based on his argument that there was insufficient evidence to support the verdict. In *State v. Freeman,* 01-997, p. 2 (La. App. 3 Cir. 12/12/01), 801 So.2d 578, 580, we noted:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436

11

So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983).

Second degree murder is defined as a killing "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. The act of pointing a gun directly at a person and pulling the trigger six times is indicative of the specific intent to kill or inflict great bodily harm. *State v. Clark,* 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, *writ denied,* 94-2715 (La. 1/9/95), 649 So.2d 418.

Defendant further argues that the eyewitnesses' testimonies were riddled with such inconsistencies as to make them so incredible that their testimonies should not have been considered by the jury. We note in passing that several of Defendant's references to the record are actually excerpts from the suppression of evidence hearing, and therefore these alleged "inconsistencies" were not heard by the jury. Although there were inconsistencies between the witnesses' trial testimonies concerning how many shots were heard, how many people were standing on the corner, what color was the gun, their substantive testimonies were consistent. The three witnesses' descriptions of the events leading up to the shooting i.e., the search for marijuana, the ensuing argument between the victim and Defendant, the Defendant telling the victim to get out of the car, the positions of the victim and Defendant outside the car, the action of the victim in turning and attempting to run away from the car and from Defendant, and the firing of multiple shots, were all consistent. Two of the three witnesses sitting in the car identified Defendant as the shooter from the photographic line-up. Any conflicts in the testimony of the witnesses are matters relating to the evidentiary weight to be accorded each of their

testimony and not the sufficiency of the evidence as a whole to convict Defendant. *State v. Mitchell,* 01-872 (La.App. 3 Cir. 2/13/02), 815 So.2d 1041, *writ denied*, 02-785 (La. 11/8/02), 828 So.2d 1110, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed 2d 652 (1982) and *State v. Nolan*, 503 So.2d 1186 (La. App. 3 Cir. 1987), *writ denied* 507 So.2d 226 (La. 1987). A review of the record demonstrates there was sufficient evidence from which the jury could reasonably have found Defendant guilty of second degree murder.

Villery, Archangel's stepbrother, present in the car at the time of the shooting, testified Archangel and the victim traveled from New Orleans to visit family. He testified he was sitting in the back seat behind his stepsister, who was driving, and they were looking for some marijuana, when Broussard, who was sitting next to him in the back seat, saw a person identified as "B" standing on a street corner. Broussard told "B" they wanted to buy some marijuana and Villery gave "B" five dollars to make the purchase. "B" then went to another person, (later identified as Defendant) who came up to the car and gave Villery a small bag of marijuana. He stated he could not describe the person "B" gave the money to, but said that he had on "sweats, green shirt, red jacket, white on the collar, and that his hair was styled in "short dreads." He testified he told the man with the marijuana (Defendant) that "it wasn't five dollars worth." Defendant then put a little more marijuana in the bag and said, "If it ain't enough you can give it back, it's gonna sell regardless." Villery then handed the bag to the victim who was sitting in the front passenger's side of the car. He stated the victim and the man then "exchanged words" whereupon Defendant told the victim to get out of the car. Villery testified the victim then got out of the car to confront Defendant. Meanwhile, the man in the red jacket (later identified as Defendant) walked around to the back side of the car. Villery stated

13

that as soon as the victim got to the back corner of the car the victim squatted down with the palms of his hands on the ground and then turned and began running across the street, away from the car and away from Defendant. He saw Defendant extend his arm upward and start shooting. He recalled hearing three shots. He testified that no one in the car had a weapon. Villery could not pick out the shooter from the pictures shown to him in the photographic line-up and stated that he could not say that Defendant was the shooter.

Shawn Broussard's testimony essentially corroborated Villery's testimony. He was sitting in the back seat behind the victim. He described the man who brought the marijuana to the car as wearing a red jacket and sporting "short dreads". He stated he heard five or six shots. He further testified, later the same day at police headquarters when he was shown a photographic line-up, he identified Defendant as the shooter. He also identified Defendant at trial as the man who shot the victim.

Brandon "B"Augustine testified he was Defendant's first cousin. He was apparently Defendant's drug runner at the scene. He stated they had been friends all of their lives. He testified his cousin wore his hair in "dreads" at the time of the shooting. His version of the events leading up to the "lil' altercation" was consistent with the testimonies of Villery and Broussard. He stated, however, when the victim got out of the car, he went around to the back of the car from the passenger side going toward the driver's side and approached Defendant and it "look like he (the victim) was going to do something". At first he testified, although he heard shots, he did not see a gun in his cousin's hand because he had run away before the shooting. However, he then admitted that he had told the grand jury that he saw Defendant with a gun. He further admitted he told the grand jury his cousin admitted shooting the victim, but then explained that he lied to the police because he was

14

afraid as he had witnessed a murder. At trial, on redirect examination, Augustine told the jury he did see Defendant shoot the victim. Augustine testified as he was running away from the car he heard the victim say, "[G]et my gun, get my gun," after he had been shot. Clearly, the jury observed for themselves the prior inconsistencies in this witness' testimonies but obviously believed his in-court testimony which was consistent with the other witnesses and physical evidence presented at trial.

Vanity Archangel testified she and the victim had just become engaged to be married. She described the shooter as not tall, with "dreads," and that he had on something red like "A T-shirt or pullover maybe. A jacket or something. It was just red." She got out of the car to try and stop the confrontation which she thought was about to take place. She stated she saw something silver come out of Defendant's pocket. After she heard shots fired, she started toward the victim. She said the shooter ran up from behind her, grabbed the victim for a second, then ran off. A short time later, only hours after the shooting, she picked Defendant out of the photographic line-up as the shooter. At trial, she identified Defendant as the shooter. She further testified as she got to the victim, he was wobbling and talking crazy. He said, "Baby, get the gun." She thought that he may have been talking about a small BB gun she had bought for her cousin which may have been in the trunk of the car at the time. Her testimony seemed to indicate the victim was not coherent.

Brandon "B" Augustine's testimony was perhaps the most problematic of the eyewitness testimonies. At trial, he stated he lied to the grand jury about seeing his cousin shoot the victim or that his cousin admitted to him he fired the shots that killed the victim; however, as noted above, he reluctantly admitted at trial he saw his cousin shoot Robert West. Donnie Lasher, a detective with the Iberia Parish Sheriff's Office, testified he interviewed Augustine the day after the shooting, and

15

Augustine told him four different versions, including that he was never there; he had left before the shooting; and that he was walking his dog when he heard the shots. Detective Lasher stated Augustine never once said he saw a gun in his cousin's hand during the interview. However, after Defendant was taken into custody, Augustine testified before the grand jury and at trial that he saw Defendant with a gun at the time of the shooting. At trial, he testified he saw his cousin, Defendant, shoot the victim multiple times as he testified there was no one else present outside the car; and, as he was running from the scene, he heard the shots and saw his cousin shooting the victim.

In *State v. Milton,* 06-550, pp. 8-9 (La. App. 3 Cir. 9/27/06), 939 So.2d 678, 683, *writs denied,* 07-643, 07-1140 (La. 12/07/07), 969 So.2d 625, 627, this court stated:

> With regard to inconsistencies between a witness's pre-trial statement and his or her trial testimony, this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):
>
> > When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.
>
> Furthermore, the jury may "accept or reject, in whole or in part, the testimony of any witness." *State v. Leger,* 04-1467, p. 19 (La.App. 3 Cir. 6/1/05), 907 So.2d 739, 754, *writ denied,* 05-2263 (La.4/17/06), 926 So.2d 509, (*quoting State v. Duncan*, 93-1384, p. 8 (La. App. 3 Cir. 4/6/94), 635 So.2d 653, 657, *writ denied,* 94-1067 (La.10/28/94), 644 So.2d 649).

It was for the jury as fact finder to accept or reject some or all of the testimony of this witness. A review of the record as a whole reveals the testimony of the

16

witnesses at trial, along with all the other evidence presented, established consistent facts upon which the jury apparently based its decision. Although there were some inconsistencies in the witnesses' testimonies, two of the three witnesses in the car identified Defendant as the shooter, as did Defendant's cousin, who was his drug runner. Moreover, the testimonies were not refuted by physical evidence. Finally, Defendant fled the scene and evaded the police for six weeks. Evidence of flight, concealment, and attempt to avoid apprehension indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may have inferred guilt. *State v. Fuller*, 418 So.2d 591 (La.1982); *State v. Emerson*, 31, 408 (La. App.2 Cir.12/9/98), 722 So.2d 373, *writ denied,* 99-1518 (La. 10/15/99), 748 So.2d 470. Accordingly, considered in a light most favorable to the State, a rational trier of fact could have found Defendant guilty of second degree murder beyond a reasonable doubt.

Defendant further complains that a detective with the Iberia Parish Sheriff's Office was allowed to testify to matters outside his area of expertise.[1] There was expert medical testimony that the bullets recovered from the victim's body were from a .22 caliber revolver. Doctor Collie Trant, a forensic pathologist, performed the autopsy of the victim. He testified the gunshot wounds were the cause of death. He also confirmed there were five wounds in the victim's back and one on the back side of the victim's arm. He estimated the shots were not fired from a distance farther than two to four feet. The gun that fired the bullets was never located.

At trial, Detective Robert Green testified while no casings from a .22 caliber gun were found, four .45 caliber casings were located in the area of the shooting. He

---

[1] In brief, appellate counsel names Detective Donnie Lasher as the officer who was not qualified as an expert in firearms identification. However, the record shows that it was Detective Robert Green who discussed the .45 caliber casings found near the scene of the shooting.

17

testified he determined the casings were not relevant to the current case because (1) the medical evidence established that the victim was shot with a gun using .22 caliber bullets, and (2) the .45 caliber casings had been on the ground for quite some time. He noted that the .45 caliber casings were found under pine needles, embedded in the grass, had dirt inside them, and there was no odor of burnt gun powder emanating from the casings. Defendant objected to the testimony regarding the .45 caliber casings, arguing that the detective was not qualified as an expert in firearms. The trial court permitted the testimony under La.Code Evid. art. 701, which allows opinion testimony under certain circumstances. Defendant does not articulate exactly how the trial court's ruling on this objection relates to the instant insufficient evidence claim. The testimony regarding the .45 casings was irrelevant.

Finally, Defendant argues because the evidence was insufficient "the trial court erred in finding him guilty of second degree murder instead of manslaughter as the record supports such a reduction." He argues the circumstances surrounding the death of the victim indicate the offense was committed in sudden passion or the heat of blood caused by the victim's provocation.

In pertinent part, manslaughter is defined in La.R.S. 14:31(A) as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

The Louisiana Supreme Court has stated that "sudden passion" and "heat of blood" are not elements of manslaughter, they are "mitigatory factors in the nature of a defense" and "exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors." *State v. Snyder*, 98-1078, p.

18

4 (La. 4/14/99), 750 So.2d 832, 837-38, *rev'd on other grounds,* 545 U.S. 1137, 125 S. Ct. 2956 (2005) and ___ U.S. ___, 128 S.Ct. 1203 (2008). Thus, an accused who establishes by a preponderance of the evidence that he was provoked to such a degree that he acted in sudden passion or heat of blood is entitled to a verdict of manslaughter. *State v. Snyder,* 98-1078 (La. 4/14/99), 750 So.2d 832 and *State v. Ellis*, 42,286 (La. 7/11/07) 961 So.2d 636, *writ denied*, 07-1641 (La. 1/25/08), 973 So.2d 753.

The three witnesses present in the car with the victim testified there were words exchanged between Defendant and the victim over the quantity of the marijuana. All three testified Defendant told the victim to get out of the car. Augustine, Defendant's cousin, testified the victim acted aggressively toward Defendant when he exited the car. Detective Lasher testified Augustine told him Defendant "mean mug[ged]" the victim, meaning that they were staring each other down. There was no testimony of what words were said between the two, nor was there any testimony that the two exchanged blows. In fact, there was eyewitness testimony that as the victim came around the back of the car he hit the ground with his palms down and then began running away as shots rang out. Generally, provocation involves physical acts or threats. *Id.* Words or gestures, no matter how offensive, will not suffice to rise to the level of mitigating conduct on the part of the victim. *State v. Brooks*, 36,855 (La. App. 2 Cir. 3/5/03), 839 So.2d 1075, *writ denied,* 03-974 (La. 11/07/03), 857 So.2d 517.

A rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that Defendant failed to establish the mitigating factors of "heat of blood" or "sudden passion" by a preponderance of the evidence.

### *ASSIGNMENT OF ERROR NUMBER FOUR*.

In his fourth assignment of error, Defendant argues he was prejudiced when the trial court refused to excuse a potential juror for cause, forcing him to use a peremptory challenge, which resulted in exhaustion of all of his peremptory challenges. As the Defendant did not object to the trial court's refusal to grant his challenge for cause, this Court will not address this assignment. "A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection." La.Code Crim.P. art. 800(A).

### *PRO-SE* ASSIGNMENT OF ERROR NUMBER 1:

Defendant argues the trial court erred when it did not grant defense counsel's motion for a mistrial. He alleges the trial court crippled his defense when it refused to allow the defense attorney to ask leading questions on cross-examination.

Louisiana Code of Evidence Article 611(C) provides:

> Generally, leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony and in examining an expert witness on his opinions and inferences. However, when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. Generally, leading questions should be permitted on cross-examination. However, the court ordinarily shall prohibit counsel for a party from using leading questions when that party or a person identified with him is examined by his counsel, even when the party or a person identified with him has been called as a witness by another party and tendered for cross-examination.

The trial court is permitted a certain amount of control over the mode of questioning so as to:

> (1) Make the interrogation and presentation effective for the ascertainment of the truth;

(2) Avoid needless consumption of time; and

(3) Protect witnesses from harassment or undue embarrassment.

La.Code Evid. art. 611(A).

"Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness." *State v. Robinson,* 01-273, p.6 (La. 5/17/02), 817 So.2d 1131, 1135. However, the ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the trial court's broad discretion. *State v. Irish*, 00-2086 (La. 1/15/02), 807 So.2d 208, 213, *cert. denied,* 537 U.S. 846, 123 S.Ct. 185 (2002). Further, the courts have held:

> A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion.

*State v. Jackson*, 07-84, p. 12 (La. App. 5 Cir. 6/26/07), 963 So.2d 432, 440, *writ denied*, 07-1666, (La. 1/25/08) 973 So.2d 754.

A review of the record reveals, during cross-examination, defense counsel continuously attempted to testify and asked leading questions of the witnesses. The State occasionally objected, and the trial court, while repeatedly granting leeway to defense counsel, sustained several of the State's objections. However, during the cross-examination of Jacobe Villery, the trial court asked both attorneys to approach the bench and admonished defense counsel for testifying rather than questioning the witness. The trial court stated:

21

Okay. I've asked you three times nicely not to testify in the case. If you have a question, ask it. The next time you start testifying I'm going to sanction you. If you have a question, ask the question. This is not a police officer. He is under cross-examination. You are entitled some leeway, but you cannot testify for the witness. Now he's already said he saw the man walk behind the car.

BY MS. BONIN:

Judge.

BY THE COURT:

If you want to ask him some questions about that, ask him some questions. Don't testify.

(Back on the record)

BY MS. BONIN:

. . . .

Q. All right. Have you ever said that -

BY THE COURT:

Would y'all excuse the jury for a minute, please. Bring the jury in the back.

(Court reporter's note: Jury excused.)

BY THE COURT:

We're having some difficulty with the manner and form in which the questions are taking place. On the one hand the Court recognizes counsel's right to full and complete cross-examination. On the other hand this Court is obligated, obligated to consider not just the rights of the accused, but under our constitution this Court is obligated to consider the rights of the citizens of Iberia Parish as well as the rights of the victim in a trial. It's not only the rights of the defendant that this Court has to protect but every one's rights. The manner and method of examination by counsel testifying and stating facts that may be misrepresented to a relatively uneducated witness is not acceptable. Counsel has been warned three times not to do that. Not to testify in the case and then asked the witness "is that correct?". All the court is requesting, is that counsel question the witness without testifying. That is the

ruling of the Court. If you'd like to state something else for the completeness of the record you may do so at this time.

BY MS. BONIN:

Yes, Judge. I would like to state for the record that the, that counsel should have the right to cross-exam by using leading questions. Leading questions are not just for police officers or hostile witnesses. Leading questions on cross-exam are permitted and that's what I have been doing.

BY THE COURT:

Well, certainly the Court recognizes that in some circumstances leading questions on cross-exam are permitted. What is objectionable to the Court in this case, and counsel for the State has interjected on rare occasions objections so as not to disrupt the flow of the trial. What is happening is that counsel is misrepresenting that which the witness has said or others have said in the form of a statement and then asked the witness "is that correct?" And that has led frequently to an attempt, either intentionally or otherwise, to in effect I guess to, to call it bluntly mislead the jury, and that cannot be permitted in any trial. I'm sorry if counsel takes offense but I am requesting and issuing an order that counsel, if she is going to ask leading questions, not testify, simply ask the witness a question and make certain that she is using facts that are in evidence in cross examination and not continue to misrepresent facts.

The following day of trial, prior to the jury being seated, defense counsel moved for a mistrial based on the fact she had "not been allowed under . . . Code of Evidence 611, Sections B and G, to ask Leading Questions." Defense counsel accused the trial court of "crippling (her) ability to make a defense." The trial court denied the motion and stated as follows:

I've given my reasons yesterday. I need not go into them in any greater detail, but I will file appropriate written reasons at the conclusion of the trial.

BY MR. ODINET:

For the record, Your Honor, the State would object to the Motion for Mistrial.

23

BY THE COURT:

> And I do want it clearly noted for the record that not only was counsel allowed to lead and cross-examine the witness, she continued to do it. It wasn't that leading nature of the questions so much that was objectionable, it was her testifying and her misleading the jury and her using facts that were not in evidence such as video tapes that had never been played, questioning witnesses from portions of video tapes that they have never seen, et cetera, et cetera, et cetera. We just had enough of it. I instructed counsel to cross-examine all she wants, ask questions but stop testifying in the case.

Based on the record it is clear the trial court did not abuse its vast discretion when it denied Defendant's oral motion for a mistrial. The record indicates the trial court went out of its way to accommodate defense counsel in the presentation of her case. Prior to cross-examining the State's witness, Brandon Augustine, the trial court advised defense counsel as follows:

> I want to make sure there's no misunderstanding about yesterday's rulings. Even though they were phrased only situations, they were meant as testifying for the witness. I agree that leading questions are permissible in cross examining. What counsel was doing was going far beyond leading. The Court does have the authority to control that type of questioning. This is a critical witness for the State and the Defense. I will allow any and all leading questions on cross-examination. If counsel is going to use prior statements, however, that has to be done in accordance with law. It can't be done the way it was being done--

Further, before closing arguments, the trial court stated to defense counsel:

> We also discussed at the conference what had transpired yesterday at the bench when the Court's instructions to counsel not to ask leading questions and to clarify that, we went over in some detail, what the Court meant by leading questions but again we went over that in the charge conference again and the Court offered to counsel the opportunity to recall a Shawn Broussard, Jacobe Villery, and other witness that had been called in order to make certain that all questions that counsel wished to ask, were asked. And that's where we stand on that. I'm willing, I'm still willing to reopen the evidence if you want

to call anyone else and ask any other questions. You may want that.

BY MS. BONIN:

No, sir. Thank you very much. I'm satisfied with that.

The trial court did not deprive Defendant of a reasonable expectation of a fair trial when it denied his motion for a mistrial. There is no merit to this assignment of error.

### *PRO-SE* ASSIGNMENT OF ERROR NUMBERS 2, 3 AND 4:

The majority of Defendant's arguments in these three assignments of error are discussed in the above assignments of error dealing with the question of whether the evidence was sufficient to convict him of second degree murder and whether the photographic line-up was suggestive.

Defendant further argues the "evidence was not considered collectively, it was done 'item-by-item." Defendant does not argue, however, how this "item-by-item" presentation of the evidence resulted in prejudice to his case.

Defendant states "Detective Scott Hotard disreguarded [sic] a key witness that had taken a picture with her camra[sic] phone of the actural[sic] shooter because he was so persistant[sic] on closing the case and did not do a full investigation." At trial, Detective Hotard testified a witness, who gave the same description of the shooter as the three witnesses in the car with the victim, had taken a picture with her cell phone camera. However, the witness had already deleted the picture by the time she told the detective about it because it had not come out very well. He testified he did not attempt to retrieve the photograph. The detective explained the girl was a mentally handicapped minor, and her mother did not want her to get involved. However, the record indicates Detective Hotard interviewed the girl at police

25

headquarters regarding her observation of the incident. As noted, the description she gave of the shooter was consistent with the description given by the victim's three friends. Defendant does not demonstrate how Detective Hotard's investigation was ineffective in this respect.

Defendant further asserts the witness, Brandon Augustine, lied, as evidenced by his inconsistent statements, and that knowing presentation of false evidence violated his right to due process. As discussed above, the witness's inconsistent statements were revealed to the jury. The weight of his testimony fell within the jury's province in judging his credibility.

### DECREE

**AFFIRMED**